UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

VILLAGE OF STILLWATER, TOWN OF STILLWATER, TOWN OF WATERFORD, WATER COMMISSIONERS OF THE TOWN OF WATERFORD, VILLAGE OF WATERFORD, TOWN OF HALFMOON and COUNTY OF SARATOGA,

Plaintiffs,

**COMPLAINT**

- vs. -

GENERAL ELECTRIC COMPANY, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LISA P. JACKSON, Administrator of the United States Environmental Protection Agency,

Defendants.

---

1. Plaintiffs, by and through their undersigned attorneys, as and for their complaint against defendants, allege as follows:

**INTRODUCTION**

2. This is action is brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et. seq., and New York State common law claims, by the Village of Stillwater, Town of Stillwater, Town of Waterford, Water Commissioners of the Town Waterford, Village of Waterford, Town of Halfmoon and County of Saratoga (hereinafter collectively "Plaintiffs" or "Municipal Plaintiffs") against General Electric Company ("GE") to recover response costs, damages and injunctive relief for the contamination of their water supplies by Polychlorinated Biphenyls (PCBs).

3. Plaintiffs further seek injunctive and declaratory relief against the United States Environmental Protection Agency ("EPA") and General Electric Company staying the dredging

of PCBs from the upper Hudson River ("River") scheduled to commence in May 2009, and compelling EPA and GE, prior to the start of dredging, to provide and finance independent alternative water supplies for plaintiffs for the entire period of dredging.

**PARTIES**

4. Plaintiff Village of Stillwater is a municipal corporation organized under the laws of the State of New York located within Saratoga County, New York.

5. Plaintiff Town of Stillwater is a municipal corporation organized under the laws of the State of New York located within Saratoga County, New York.

6. Plaintiff Town of Waterford is a municipal corporation organized under the laws of the State of New York located within Saratoga County, New York.

7. Plaintiff Water Commissioners of the Town of Waterford is a duly authorized body organized under the laws of the State of New York located within Saratoga County, New York.

8. Plaintiff Village of Waterford is a municipal corporation organized under the laws of the State of New York located within Saratoga County, New York.

9. Plaintiff Town of Halfmoon is a municipal corporation organized under the laws of the State of New York located within Saratoga County, New York.

10. Plaintiff County of Saratoga is a municipal county organized under the laws of the State of New York.

11. Defendant General Electric Company is a company organized under the laws of the State of New York with a principal place of business in Schenectady, New York.

12. Defendant United States Environmental Protection Agency is the federal agency charged with administration of the Hudson River PCB Superfund Site.

13. Defendant Lisa P. Jackson is the Administrator of the United States Environmental Protection Agency.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 9601 et. seq., because this action arises under the laws of the United States, specifically the above cited Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

15. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16. Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b) & (e) and 42 U.S.C. § 9613(b).

## GE'S PCB CONTAMINATION OF THE HUDSON RIVER

17. At all relevant times, defendant General Electric Company ("GE") owned and operated two capacitor manufacturing plants located, respectively, at 5 John Street in the Village of Hudson Falls, State of New York and 381 Upper Broadway, in the Town of Fort Edward, State of New York.

18. The GE Hudson Falls and GE Fort Edward plants were located adjacent to and/or near the Hudson River.

19. Polychlorinated Biphenyls (PCBs) were used by General Electric in the manufacturing of industrial capacitors at the Hudson Falls and Fort Edward plants.

20. PCBs are hazardous substances within the meaning of CERCLA § 101(14); 42 U.S.C. § 9601(14).

21. PCBs are ranked 5th on the CERLCA Priority List of Hazardous Substances

maintained by the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (ATSDR). *See* CERLCA § 104(i)(2); 42 U.S.C. § 9604(i)(2).

22. In 1976, Congress enacted the Toxic Substances Control Act (TSCA) that included, among other things, prohibitions on the commercial manufacture, processing, and distribution of PCBs.

23. Over approximately a 30-year period between 1947 and 1977, General Electric used, stored and disposed of PCBs, PCB oils and/or electrical capacitors containing PCBs at the Hudson Falls and Fort Edward capacitor plants.

24. General Electric's use, storage and disposal of PCBs and PCB containing materials at the aforementioned sites resulted in the release of PCBs into the environment, including groundwater, surface water, air, soil, and sediments at, in, and adjacent to the Hudson River.

25. The PCBs disposed of by GE and discharged into the Hudson River contaminated the water and sediments of the upper Hudson River, including the drinking water supplies of the municipal plaintiffs.

26. Upon information and belief, significant amounts of PCBs have contaminated soils and groundwater at the Hudson Falls facility as the result of spills, leaks, cleaning, storage and disposal procedures.

27. Upon information and belief, the Hudson Falls facility released PCBs that flowed directly and indirectly from the site into the Hudson River, including discharges from the former 002 wastewater outfall pipe at the facility.

28. Upon information and belief, PCBs continue to leach from the Hudson Falls site into the Hudson River.

29. Upon information and belief, significant amounts of PCBs have contaminated soils and groundwater at the Fort Edward facility, as the result of spills, leaks and cleaning, storage and disposal procedures.

30. Upon information and belief, the Fort Edward facility released PCBs that flowed directly and indirectly from the site to the Hudson River, including discharges from the former 004 wastewater outfall pipe at the facility.

31. Upon information and belief, the Fort Edward facility was used as a landfill for the disposal of wastes containing PCBs, and the site contains a reservoir of PCB contaminated oil.

32. Upon information and belief, PCBs continue to leach from the Fort Edward site into the Hudson River.

33. The United State Environmental Protection Agency has estimated that the total quantity of PCB's directly discharged by General Electric from the two plants into the river from the 1940s to 1977 are as high as 1,300,000 pounds.

34. Upon information and belief, the predominant sources of PCB contamination to the upper Hudson River were the two capacitor manufacturing plants owned and operated by General Electric.

35. PCBs have been found in water, sediments, plant life, animal life and the soils at the Hudson Falls and Fort Edward sites.

36. Upon information and belief, once discharged from the GE plants, PCBs adhere to river sediments, are carried in the water column, and disseminate and accumulate downriver as they settle in impounded pools and other depositional areas.

37. River scouring/erosion and other mechanisms, both naturally occurring and

manmade, have mobilized PCB-contaminated sediments from the extensive deposits, redepositing them farther downriver to the south of the plaintiff municipalities all the way to the Battery at New York Harbor.

38. Upon information and belief, sediments contaminated by GE's discharge of PCBs into the river continue to serve as the major source of PCBs within the upper Hudson River, including the drinking water supplies of the municipal plaintiffs.

39. GE's use, storage and disposal of PCBs that migrated into the Hudson River constitutes a release of hazardous waste in violation of federal and state law.

40. As a direct and proximate result of GE's acts and omissions, particularly the release of PCBs, PCB oils and/or electrical capacitors containing PCBs, the municipal plaintiffs drinking water supplies have been contaminated by PCBs.

41. As a direct and proximate result of GE's acts and omissions, particularly the release of PCBs, PCB oils and/or electrical capacitors containing PCBs, the municipal plaintiffs' drinking water supplies are at risk of continuing and future contamination by PCBs.

42. Upon information and belief, the proposed dredging of the Hudson River will result in further PCB contamination of said drinking water supplies, poses an imminent public health hazard, and requires that the plaintiff municipalities take responsive action and incur costs to secure alternative drinking water supplies.

**ADVERSE HEALTH EFFECTS ASSOCIATED WITH PCBS**

43. PCBs are classified by United States Environmental Protection Agency and the International Agency for Research on Cancer as probable human carcinogens.

44. Upon information and belief, this classification means that there is sufficient evidence to show that PCBs cause cancer in animals, and that there is evidence that PCBs cause

cancer in humans.

45. Upon information and belief, PCBs are also linked to other serious non-cancer adverse health effects based on observations in animals, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.

46. Upon information and belief, emerging studies in humans provide evidence for potential carcinogenic and non-carcinogenic effects of PCBs.

47. Upon information and belief, human health studies indicate that PCBs adversely affect reproductive function.

48. Upon information and belief, PCBs affect a variety of liver enzymes which are capable of altering the female hormone estrogen and other estrogenic chemicals.

49. Upon information and belief, maternal exposure to PCBs can result in decreased gestational age and reduced birth weight of offspring.

50. Upon information and belief, PCBs adversely affect neurobehavioral and cognitive development.

51. Upon information and belief, infants exposed to PCBs in utero or via breast milk may experience neurobehavioral deficits including, among other things, depressed responsiveness, impaired visual recognition, poor short-term memory, deficiencies in psychomotor development, and reduced performance on visual recognition-memory tests.

52. Upon information and belief, exposure to PCBs during fetal development and early childhood can result in neurologic injury resulting in, among other things, an irreversible reduction in intelligence and alteration of behavior.

53. Upon information and belief, PCBs are also associated with adverse effects on thyroid function in adults and children and on immunological function.

54. Upon information and belief, PCB-induced immunosuppression is associated with increased rates of infections, and respiratory disease.

55. Upon information and belief, children are particularly sensitive to the effects of PCBs on neurological development, immune system function, and thyroid function.

56. Upon information and belief, thyroid hormones are essential for normal brain development, and PCBs have been shown to alter thyroid function during critical periods of brain development.

57. Upon information and belief, exposure to PCBs is associated with adverse effects on human metabolism.

58. Upon information and belief, PCBs cause hormonal effects that affect both insulin secretion and thyroid gland function, resulting in alterations of serum lipids, increased incidence of hypertension, and diabetes.

59. Upon information and belief, at high doses, PCBs can cause liver enlargement, fatty degeneration, hepatocellular necrosis (cell death), and changes in the bile duct.

60. Upon information and belief PCBs are "persistent" pollutants that are cleared very slowly from the body, and once ingested or absorbed by a person, they become stored in fat and fatty tissues. This stored material is referred to as the "body burden" of PCBs.

61. Upon information and belief, a comprehensive determination of body burden is critical to exposure and health risk assessment for PCBs.

62. Upon information and belief, PCB body burden is defined as the level of each congener in fatty tissue, and PCB body burden increases whenever the intake exceeds the clearance.

63. Upon information and belief, the concept of "exposure" for persistent pollutants

such as PCBs is very different from that for non-persistent chemicals and drugs such as benzene or Tylenol. For the latter compounds, which are rapidly cleared from the body and therefore do not result in long-term storage in the body, the likelihood of adverse health effects is determined by the amount of each individual dose. In contrast, for PCBs, a virtually identical body burden can be achieved either by ingesting one large dose or several smaller ones.

**HUDSON RIVER PCB DREDGING PROJECT**

64. In September 1984, the United States Environmental Protection Agency (EPA) placed a 200 mile stretch of the upper Hudson River, designated as the Hudson River PCB Superfund Site (the "Site"), on the National Priorities List.

65. The National Priorities List is the list of hazardous waste sites with known releases or threatened releases of hazardous substances, pollutants, or contaminants which are eligible for long-term remedial action financed under the federal Superfund program.

66. In 1984, EPA issued a Record on Decision for the Site. An interim "No Action" remedy was selected for the Hudson River sediments because of uncertainty surrounding the reliability and effectiveness of technologies available to remediate the contaminated river sediment.

67. Then, in 1989, EPA imitated a reassessment and feasibility study that proposed a plan for remediation of river sediments.

68. In February 2002, EPA issued another Record on Decision ("2002 ROD") calling for targeted environmental dredging and removal of approximately 2.65 million cubic yards of PCB-contaminated sediment from over a 43-mile stretch of the upper Hudson River (the length of river between Hudson Falls and the Federal Dam at Troy, New York).

69. The 2002 ROD provides that the selected response action is necessary to protect

the public health, welfare, or the environment from an imminent and substantial endangerment from actual or threatened releases of hazardous substances into the environment.

70. Upon information and belief, the cost of the upper Hudson River dredging project is estimated at over $700 million.

71. The aforementioned dredging project will be the longest PCB dredging project ever conducted.

72. The dredging project divides the upper Hudson River into three sections: Section 1 (former Fort Edward Dam to the Thompson Island Dam); Section 2 (Thompson Island Dam to the Northumberland Dam); and Section 3 (Northumberland Dam to the Federal Dam and Troy Lock).

73. According to the EPA, remedial dredging will be conducted in two phases. Phase 1 is scheduled to commence in May 2009. Phase 1 dredging will occur at pre-determined locations in Section 1 of the River, which is upstream of the plaintiff municipalities. Phase 2 dredging will occur in Sections 1, 2 and 3 of the River, which are primarily upstream and/or adjacent of the plaintiff municipalities.

74. The EPA estimates that the total mass of PCBs to be dredged in Section 1 is 36,000 kg; in Section 2 is 23,600 kg; and Section 3 is 6,700 kg.

75. The 2002 ROD requires that the project meet Engineering Performance Standards containing objective criteria to assure that dredging would comport with human health and environmental standards.

76. The removal of PCBs from the River will include the use of "clam shell" equipment that pulls targeted sediments from the river bottom to the river surface.

77. The 2002 ROD provides that "EPA will increase monitoring of water supply

intakes during each project construction phase to identify and address possible impacts on water supplies drawn for drinking water. The locations, frequency and other aspects of monitoring of the water supplies in the Upper and Lower Hudson will be developed with public input and in consultation with New York State during remedial design."

78. The 2002 ROD identified the Town of Waterford and Town of Halfmoon as the only municipal water supply intakes on the upper Hudson River.

79. The 2002 ROD states that the EPA maximum contaminant level (MCL) for drinking water is 500 ng/L total PCBs (i.e., 500 parts per trillion or "500 ppt").

80. The 2002 ROD states that the New York State standard for protection of human health and drinking water sources is 90 ng/L total PCBs (90 ppt).

81. EPA has set a Maximum Containment Level Goal (MCLG) for PCBs in drinking water of zero (0.00 ppt).

82. A MCLG of zero is the PCB level that EPA believes would not result in any human health hazards.

83. The February 2002 ROD assumes that both the current and projected future combined upstream PCB load does not exceed the New York State standard for protection of human health and drinking water sources (0.09 ng/L total PCBs ) or the federal MCL (0.5 ng/L total PCBs) for potable drinking water supplies.

84. EPA is required by law to comply with the standards set forth in the 2002 ROD for the protection of human health.

85. CERLCA requires that any New York State environmental standard which is more stringent than any federal standard be applied to the remedial action.

86. The 2002 ROD left open for subsequent design and implementation the specific

response measures to be undertaken for the protection of public drinking supplies impacted by the dredging project, including attainment of the applicable New York State and federal standards.

87. CERLCA requires that the EPA's selected response measures take into account, among other things:

- "the persistence, toxicity, mobility, and propensity to bioaccumulate of such hazardous substances and their constituents";
- "short and long-term potential for adverse health effects from human exposure";
- "long-term maintenance costs";
- "the potential for future remediation action costs if the alternative remedial action were to fail"; and
- "the potential threat to human health and the environment associated with excavation, transportation, and redisposal or containment."

CERCLA § 121; 42 U.S.C. § 9621.

87. CERCLA further requires that the response measure selected shall be "protective of human health and the environment, that is cost effective, and that utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable."

88. In 2005, EPA entered into a Consent Order with General Electric. The consent order adopts the dredging remedy selected by the 2002 ROD.

89. Under the consent order, GE is required to perform Phase 1 of the dredging. GE has the option of opting out of the performance of Phase 2.

90. Upon information and belief, prior to selection of the response measures to be

designed and implemented to protect public drinking water supplies, EPA capped the total response costs that GE is obligated to pay for performance of the dredging project.

91. The consent order requires that GE pay up to $43,000,000 dollars of EPA's response costs for Phase 1 and, if GE elects to perform Phase 2, to pay up to an additional $32,500,000 of EPA's response costs for the remainder of the project.

**VILLAGE OF STILLWATER AND TOWN OF STILLWATER**

92. The Village of Stillwater and the Town of Stillwater, are located along the Hudson River in Saratoga County, New York.

93. The Village owns and operates a public drinking water supply that services water users within the Village of Stillwater and the Town of Stillwater.

94. The Village's water supply is located downriver from General Electric's Hudson Falls and Fort Edward plants.

95. The drinking water supply consists of a well field system that draws water from a series of groundwater wells. Each of the wells are located within 125 to 500 feet of the Hudson River.

96. The Village provides its water users with, on average, approximately 300,000 gallons of water per day.

97. The Village services the water consumption needs of approximately 4,000 people on a daily basis.

98. In January 2008, the Village of Stillwater was under review by New York State Department of Health (NYSDOH) and New York State Department of Environmental Conservation (NYSDEC) for proposed improvements to its water treatment plant (WTP).

99. In evaluating the availability of certain potential improvements of its water

treatment plant, and before committing to significant capital expenditures to continue the operation of the same, the Village decided to test its water supply for the presence of PCBs.

100. On or about January 8, 2008, the Village provided water samples from each of its groundwater wells to an independent laboratory for PCB testing.

101. By report dated January 29, 2008, the laboratory advised that the water samples were analyzed utilizing the USEPA 508 Method for PCB screening. The analysis indicated an "absence" of PCBs for each of the samples tested.

102. In reliance upon the January 2008 PCB test results, the Village entered into an Order on Consent with NYSDEC, together with separate negotiations with NYSDOH, for the continued operation, upgrade and improvement of its water treatment plant.

103. Between January 2008 and July 2008, the Village expended significant resources and monies for improvements to its water treatment plant.

104. In May 2008, the NYSDOH began PCB monitoring of public drinking water supplies for Hudson River communities in connection with the Hudson River PCB Dredging Project.

105. On July 16, 2008, the Village was advised by NYSDOH that testing performed in conjunction with the monitoring program revealed the presence of PCB contamination in the Village's wells.

106. Specifically, the NYSDOH sampled the raw water input (before treatment) and finished water output (after treatment) at the Village's water treatment plant on May 30, 2008 and June 26, 2008.

107. Utilizing the EPA 508 and Green Bay screening methods, the NYSDOH samples taken in May and June 2008 revealed PCB concentrations up to 119 ng/L (i.e., 119 parts per

trillion).

108. Subsequent sampling by NYSDOH was performed on July 17, 2008, July 31, 2008, August 14, 2008, August 28, 2008, September 11, 2008, September 25, 2008, October 14, 2008, October 23, 2008, November 6, 2008, November 30, 2008 and December 30, 2008.

109. Each of the NYSDOH tests results revealed PCB contamination levels in the Village's raw input and finished output water at its water treatment plant, and the Village's finished output water tested positive for PCBs as high as 200 ppt on October 23, 2008.

110. Upon information and belief, PCB contamination levels are anticipated to rise during periods of high turbidity in the Hudson River, such as the Spring, which is a period of high turbidity.

111. Upon information and belief, the proposed dredging of the Hudson River, scheduled to commence in May 2009, is further anticipated to increase the levels of PCB contamination in the Village's drinking water supply.

112. The PCB contamination of the Village and Town's drinking water supply occurred prior to the proposed upper Hudson River PCB dredging project.

113. The dredging project shall not remediate the Village's well field and water supply.

114. Upon information and belief, PCBs shall continue to contaminate the Village's well field and water supply indefinitely after dredging.

115. The Village of Stillwater and Town of Stillwater are entitled to recover response costs, cleanup and removal costs, and direct and indirect damages as a result of the contamination of its property and water supply, including but not limited to: loss of use; impairment of value; investigation; monitoring; testing; remediation costs and/or obtaining

alternative drinking water supplies; and other damages associated with providing drinking water to their water users and customers.

116. The Village of Stillwater has also suffered damages related to the capital investment and improvement of its water treatment plant, compliance with regulations and orders of the New York State Department of Environmental Conservation and New York State Department of Health, potential civil penalties as the result of regulatory enforcement, all as the proximate result of the contamination of its well field and water supply.

**TOWN OF WATERFORD, WATER COMMISSIONERS OF THE TOWN OF WATERFORD AND VILLAGE OF WATERFORD**

117. The Town of Waterford and Village of Waterford are located along the Hudson River in Saratoga County, New York.

118. The Town's existing water treatment plant dates back to 1885, and the Town has exclusively drawn water from the Hudson River since said time.

119. The Town's water intake is downriver from General Electric's Hudson Falls and Fort Edward plants.

120. Pursuant to Chapter 391 of the laws of 1912 of the State of New York, as amended, the Town has duly appointed the Water Commissioners of the Town of Waterford to manage, operate and maintain a system of water works for the supply of water to the Town of Waterford and its inhabitants.

121. Pursuant to the enabling legislation, any system of waterworks purchased, acquired or constructed by the Water Commissioners "must be equipped by said commissioners so as to secure clean, clear, pure and wholesome water."

122. The Water Commissioners have, at all relevant times, constructed, managed, operated and maintained said water works system. In 1913, the system was acquired and

upgraded with coagulation, filtration, aeration and disinfection. In 1957, the treatment facility was upgraded to extend its service life and meet growing demands. Improvements to the storage and distribution system were made between 1958 and 1960. Subsequent upgrades to the treatment process include aeration, chemical addition, flocculation, sedimentation and intake facilities.

123. The Water Commissioners have periodically constructed a distribution system to service the Village of Waterford, the Northside Fire District, the former Riverside Fire District, and all other applicable water users within the borders of the Town of Waterford.

124. The water distribution system provides water to the Town of Halfmoon. Currently the Town of Halfmoon purchases up to 1,000,000 gallons of water per day from the Water Commissioners of the Town of Waterford.

125. The Water Commissioners service the water consumptions needs of approximately 10,000 people on a daily basis plus users from the Town of Halfmoon, and currently provides on average, approximately 1,590,000 gallons of water per day to said water users.

126. The Water Commissioners periodically have tested its water system for PCBs using the EPA 508 Method of screening.

127. Prior to sampling and testing performed by the New York State Department of Health in May 2008, all prior screening for PCBs by the Water Commissioners resulted in nondetectable levels of PCBs.

128. By letter dated July 16, 2008, the NYSDOH advised the Water Commissioners that that testing performed in conjunction with the Hudson River PCB Dredging Project revealed the presence of PCB contamination in the Town’s water supply.

129. Specifically, the NYSDOH sampled the raw water input (before treatment) and finished water output (after treatment) at the Town's water treatment plant on May 30, 2008 and June 26, 2008.

130. Utilizing the EPA 508 and Green Bay screening methods, the NYSDOH samples taken in May and June 2008 revealed PCB concentrations up to 32 ng/L (i.e., 32 parts per trillion).

131. Upon information and belief, PCB levels in the Town's water distribution system have since exceeded 90 ppt.

132. Upon information and belief, PCB levels are anticipated to rise during warmer water temperatures of the Hudson River.

133. In periods of high demand, emergency situations or poor water quality in the Hudson River, the Water Commissioners purchase water from the City of Troy.

134. At times, the Town of Waterford has also experienced periods of turbidity in the Hudson River resulting in the Water Commissioners having to obtain water from Troy.

135. Upon information and belief, increased turbidity leads to the release of sediments into the water column, including sediments contaminated by PCBs.

136. Upon information and belief, the proposed dredging of the Hudson River, scheduled to commence in May 2009, is anticipated to increase the release of PCB contaminated sediments into the water column in the River.

137. Upon information and belief, the dredging of the Hudson River, is anticipated to increase the threat of PCB contamination of the Town's drinking water supply.

138. The Town of Waterford, Water Commissioners of the Town of Waterford and Village of Waterford are entitled to recover response costs, cleanup and removal costs, and

direct and indirect damages as a result of the contamination of its property and water supply, including but not limited to: loss of use; impairment of value; investigation; monitoring; testing; remediation costs and/or obtaining alternative drinking water supplies; and other damages associated with providing drinking water to the Town and Water Commissioners' water users and customers.

139. The Town of Waterford and the Water Commissioners of the Town of Waterford have also suffered damages related to the capital investment and improvement of its water treatment plant, compliance with regulations and orders of the New York State Department of Environmental Conservation and New York State Department of Health, potential civil penalties as the result of regulatory enforcement, all as the proximate result of the contamination of its well field and water supply.

**TOWN OF HALFMOON**

140. The Town of Halfmoon is located along the Hudson River in Saratoga County, New York.

141. The Town maintains, operates and manages a water plant and distribution system that provides drinking water to residents of the Town.

142. The Town's water system draws water from the Hudson River.

143. The system's water intake is downriver from General Electric's Hudson Falls and Fort Edward plants.

144. The Town's water system services the consumptions needs of approximately 14,000 people on a daily basis, and currently provides on average, approximately 2,000,000 gallons of water per day to said water users.

145. Periodically, the Town has tested its water system for PCBs using the EPA 508

Method of screening.

146. Prior to sampling and testing performed by the New York State Department of Health in May 2008, all prior screening for PCBs by the Town of Halfmoon resulted in nondetectable levels of PCBs.

147. By letter dated July 16, 2008, the NYSDOH advised the Town of Halfmoon that that testing performed in conjunction with the Hudson River PCB Dredging Project revealed the presence of PCB contamination in the Town's water supply.

150. Specifically, the NYSDOH sampled the raw water input (before treatment) and finished water output (after treatment) at the Village's water treatment plant on May 30, 2008 and June 26, 2008.

151. Utilizing the EPA 508 and Green Bay screening methods, the NYSDOH samples taken in May and June 2008 revealed PCB concentrations up to 29 ng/L (i.e., 29 parts per trillion).

152. Upon information and belief, the proposed dredging of the Hudson River, scheduled to commence in May 2009, is anticipated to increase the release of PCB contaminated sediments into the water column in the River.

153. Upon information and belief, the dredging of the Hudson River, is anticipated to increase threat of PCB contamination of the Town's drinking water supply.

154. The Town of Halfmoon is entitled to recover response costs, cleanup and removal costs, and direct and indirect damages as a result of the contamination of its property and water supply, including but not limited to: loss of use; impairment of value; investigation; monitoring; testing; remediation costs and/or obtaining alternative drinking water supplies; and other damages associated with providing drinking water to the Town of Halfmoon's water users and

customers.

155. The Town of Halfmoon has also suffered damages related to the capital investment and improvement of its water treatment plant, compliance with regulations and orders of the New York State Department of Environmental Conservation and New York State Department of Health, potential civil penalties as the result of regulatory enforcement, all as the proximate result of the contamination of its well field and water supply.

**COUNTY OF SARATOGA**

156. The water users within the Village of Stillwater, Town of Stillwater, Town of Waterford, Village of Waterford and Town of Halfmoon are all residents of the County of Saratoga, New York ("County").

157. The County has an interest in ensuring the public health and safety of its residents, including the safety of the public water supplies of the municipal subdivisions within the County.

158. The County also owns property on and along the areas of the Hudson River that has been and shall continued to be contaminated by PCBs disposed of and/or released by defendant General Electric Company into the river.

159. As a direct and proximate result of the aforesaid, defendant's actions have impaired important governmental functions.

160. As a direct and proximate result of the aforesaid The County's property values have been adversely affected by defendants' actions and inactions including the aforementioned disposal of PCBs.

161. As a direct and proximate result of the aforesaid, the County has lost and will continue to lose significant amounts of sales tax revenue.

162. As a direct and proximate result of the aforesaid, the County has lost and will continue to lose significant amounts of property tax revenue

163. As a direct and proximate result of the aforesaid, the County has suffered and will continue to suffer adverse effects on population levels.

164. As a direct and proximate result of the aforesaid, the County has suffered and will continue to suffer adverse effects on the overall quality of the County's environment.

165. As a direct and proximate result of the aforesaid, the County has suffered and will continue to suffer costs in the development of alternative water system(s).

166. As a direct and proximate result of the aforesaid, the County has suffered, and will continue to suffer damages to personal property owned by the County.

167. As a direct and proximate result of the aforesaid, the County has suffered, and will continue to suffer damages to real property owned by the County.

168. Accordingly, the County incorporates by reference and joins in the claims of the Village of Stillwater, Town of Waterford, Water Commissioners of the Town of Waterford, Town of Halfmoon, Town of Stillwater and Village of Stillwater.

**EPA'S FAILURE TO PROTECT THE MUNICIPAL DRINKING WATER SUPPLIES IN VIOLATION OF CERCLA AND THE 2002 ROD**

169. The proposed upper Hudson River PCB dredging project will not protect the drinking water supplies of the municipal plaintiffs.

170. To the contrary, upon information and belief, the project will further endanger plaintiffs' water supplies.

171. Upon information and belief, the project as designed and to be implemented fails to comply with the 2002 ROD, which requires, among other things, compliance with applicable state and federal water standards.

172. The Village and Town of Stillwater's public drinking water supply adjacent to the Hudson River was not considered by the EPA prior to the July 2008 discovery of PCBs in the Village's water supply.

173. By letter dated July 22, 2008, the Village demanded that EPA provide the Village with an alternative source of drinking water prior to the scheduled start of dredging in May 2009.

174. Subsequently, EPA engaged in a technical review to determine whether a connection existed between the Hudson River and the Village's well field, whether PCBs in the Hudson River were impacting the Village's water supply, and to evaluate potential alternative water supply options for the Village during dredging, including connections to independent private or public water supplies.

175. On September 10, 2008, EPA met with Village officials to discuss the PCB contamination of the Village's water supply.

176. EPA subsequently issued a report dated November 2008 entitled "Water Evaluation – Alternative Water Supply for the Village of Stillwater."

177. By letter dated November 24, 2008, the Village responded to EPA's water evaluation report, and again repeated its request for a connection to an independent water supply.

178. By letter dated December 15, 2008, EPA confirmed that a connection existed between the Hudson River and the Village's well field, and "that the level of PCB contamination in the aquifer exceeds the New York State groundwater standard of 90 parts per trillion."

179. Despite the violation of New York State groundwater standards, EPA has not

committed to undertake any action for the remediation of the Village and Town's water supply.

180. Instead, EPA has proposed to install a temporary granulated activated carbon (GAC) filtration system at the Village's water treatment plant as a contingency measure during Phase I of the dredging project to address potential increased levels of PCBs that may result from dredging.

181. EPA will not provide the Village and Town with an independent alternative water supply before the scheduled start of dredging in May 2009.

182. On December 30, 2008 representatives from EPA met with Village officials to discuss the PCB contamination of the Village's water supply.

183. On or about January 15, 2009, EPA sent the Village of Stillwater a 90% design plan for the proposed temporary GAC filtration system.

184. On January 27, 2009, EPA requested access from the Village of Stillwater for the purpose of constructing the temporary GAC system.

185. By Order dated February 3, 2009, EPA issued an administrative order directing the Village of Stillwater to comply with its request for access to construct the temporary GAC system.

186. Upon information and belief, the proposed temporary GAC filters shall not remove all PCBs from the Village and Town's water supply.

187. In fact, the Alternatives Analysis prepared by EPA's engineers concedes that a certain percentage of PCBs shall not be removed by the GAC filters.

188. Upon information and belief, the proposed GAC filters are subject to saturation rendering the filters ineffective.

189. Upon information and belief, the amount of any unfiltered PCBs will be not be

known until after the PCBs have been consumed by water users.

190. Despite purporting to have analyzed all available options, the subject Alternatives Analysis refused to even consider the temporary delay of the dredging project in order to allow the Village to connect to an independent water supplier, either one presently available or still under construction such as the Saratoga County Water Authority.

191. Upon information and belief, the proposed installation of temporary GAC filters fails to protect human health and safety; fails to protect against short and long-term adverse health effects of PCB; fails to protect against the bioaccumulation of PCBs; is not a long-term solution; fails to utilize alternative technologies to the maximum extent practicable; is not cost effective, especially in comparison to the cost of a permanent, long-term independent water supply; and fails to utilize permanent solutions that are protective of human health and safety.

192. Moreover, EPA has acknowledged that the temporary GAC filtration system is not a viable long-term solution.

193. EPA's December 15, 2008 letter states: "Please be assured that we agree that the long-term solution that makes the most sense for Stillwater's water supply is a permanent new water system, and … [w]e have also spoken with representatives of the State of New York, who share our concern about the need to identify a long-term solution to the existing groundwater contamination."

194. EPA has acknowledged that the PCB contamination of the Village's well field will not be remediated by the EPA's Upper Hudson River PCB Dredging Project.

195. EPA has further advised that General Electric has not agreed to fund a independent alternative water supply for the Village and Town of Stillwater.

196. In contrast, EPA has agreed to construct a pipeline connecting the Town of

Waterford and Town of Halfmoon to an alternative independent water supply prior to dredging.

197. The Village and Town demands that EPA extend the same treatment to the residents of Stillwater and provide an alternative drinking water supply other than the Hudson River before dredging.

198. EPA has also failed to design and implement measures to protect the Town of Waterford and Town of Halfmoon's drinking water supplies during dredging, including compliance with applicable New York State and federal water standards.

199. EPA has agreed to construct a pipeline from the City of Troy to the Town of Waterford that is capable of servicing the Town of Waterford and Town of Halfmoon.

200. However, EPA has refused to pay for the increased costs of obtaining water from Troy throughout the entire period of dredging.

201. Specifically, EPA has stated that during Phase I, it will not "pay for the Town's increased costs associated with using Troy water during times that dredging related PCB levels in the Upper Hudson River are below 500 parts per trillion ("ppt") or where there is sufficient time to notify the water system operators of the river water sampling results."

202. In contrast, during Phase II of the dredging, which will occur further downriver towards the Town of Waterford and Town of Halfmoon, the EPA has agreed to pay for the increased costs of obtaining water from Troy.

203. Initially, EPA's use of the 500 ppt standard is contrary to the water quality standards required by the 2002 ROD.

204. The 2002 ROD states that the New York State standard for protection of human health and drinking water sources is 90 ng/L total PCBs (90 ppt).

205. The February 2002 ROD states that both the current and projected future

combined upstream PCB load shall not exceed the New York State standard for protection of human health and drinking water sources (0.09 ng/L total PCBs ) or the federal MCL (0.5 ng/L total PCBs) for potable drinking water supplies.

206. No waiver or exception for compliance with the New York State 90 ppt standard is permitted by the 2002 ROD.

207. Accordingly, EPA has failed to design and implement measures that ensure compliance with state and federal water standards as required by the 2002 ROD.

208. EPA's May 8, 2008 letter further states that because Phase 1 "will occur over 30 miles from the Waterford and Halfmoon intakes. Any PCBs that are resuspended during dredging will be blended with clean river water from other tributaries – in other words, diluted – before they reach the water supplies, which will substantially reduce the concentrations of PCBs in river water that could potentially reach the intakes."

209. Upon information and belief, this statement is contrary to results observed in the River, including data complied by GE and EPA's engineers.

210. It further ignores the resuspension and accumulation of PCBs downriver in previously identified "hot spots" that are downriver and in proximity to the Towns.

211. Phase 2 will dredge these very same hot spots of accumulated PCB sediments.

212. Moreover, EPA has not proffered, let alone established, that it will be able to detect, at all relevant times and places in the River, when PCB levels exceed 90 ppt or 500 ppt in both sediments, suspended sediments and/or the water column.

213. EPA's May 9, 2008 letter states that the Hudson River will be "carefully monitored during the dredging, and the dredging must stop if a confirmed exceedance of PCBs is detected in Hudson River water at 500 ppt or greater."

214. Despite the fact that dredging is scheduled to start in May 2009, EPA has failed to articulate in detail the specifics of the alleged PCB river monitoring and testing program for the Town of Waterford and Town of Halfmoon drinking water supplies.

215. In fact, EPA has delegated to GE the duty of designing and engineering a plan to protect the towns' drinking water supplies.

216. On February 5, 2009, GE issued a proposed revised "Phase 1 Remedial Action Community Health and Safety Plan."

217. Upon information and belief, the proposed revised plan was issued because the prior plan failed to protect human health and safety, including plaintiffs' drinking water supplies.

218. According to the proposed revised plan, GE intends to take "two 12 hour composite samples" of the water column at the Thompson Island "far-filed" monitoring station "at times when that is warranted based upon the estimated time of travel of the water from that station to the Halfmoon intake."

219. The samples are then to be tested at a "laboratory on an expedited basis (within 8 hour of collection, to the maximum extent practicable), so that, to the maximum extent practicable, at least 4 hours advance notice prior to estimated arrival of a contaminated parcel as the Halfmoon and Waterford water supply intakes is provided to … those water supplies. (In the event the Thompson Island automated sampler fails, these procedures will be followed for the samples from Schuylerville).

220. Upon receipt of the test results, GE intends to notify the towns if "ambient total PCB levels" exceed 500 ppt—i.e., so that the towns can switch over to Troy water.

221. GE's proposed plan to protect human health and safety is vague, references

undisclosed standards and procedures, ignores and lacks meaningful data, fails to comply with the New York State standard for protection of human health and drinking water sources of 90 ng/L total PCBs (90 ppt), and relies upon erroneous and unsupported assumptions that render the plan arbitrary and without rationale basis.

222. For example, upon information and belief, the revised February 2009 Community Health and Safety uses a lower standard for testing PCBs that fails to test total PCBs.

223. For example, Upon information and belief, the proposed PCB sampling program ignores the reintroduction of PCBs and PCB contaminated sediments into the Hudson River from adjacent aquifers and ground waters during rain storm events.

224. EPA has not disclosed the technical methodology or feasibility of the monitoring, sampling and testing program.

225. EPA acknowledges that it cannot guarantee specific sediments, suspended sediments or water columns containing elevated levels of PCBs will in fact be caught and measured by the monitoring and sampling equipment.

226. EPA cannot guarantee that test results will be turned around in sufficient time, i.e., the time of travel in which PCBs migrate downriver from the dredged location to the towns' water plants.

227. Upon information and belief, river currents, weather or other river conditions at any given time may affect the PCB time-of-travel downriver, thereby potentially leaving insufficient time to sample, test and notify the towns to stop drawing river water.

228. EPA has not addressed whether PCB contaminated water that is initially sampled may subsequently accumulate with PCB contaminated sediments/water further downriver into higher PCB concentrations before they reach the towns' water plants.

229. Upon information and belief, the proposed revised monitoring and sampling program fails to protect human health and safety; fails to comply with water standards required by the 2002 ROD; fails to protect against short- and long-term adverse health effects of PCB; fails to protect against the bioaccumulation of PCBs; fails to utilize alternative technologies to the maximum extent practicable; is not cost effective; and fails to utilize an available permanent solution that is protective of human health and safety.

230. EPA and GE should be compelled to design and implement response measures that comply with CERCLA, the 2002 ROD and are protective of the plaintiffs' drinking water supplies and human health and safety.

**FIRST CAUSE OF ACTION BY ALL PLAINTIFFS AGINST EPA AND GE – INJUNCTIVE RELIEF**

231. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

232. Upon information and belief, the proposed dredging of upper Hudson River sediments shall result in the actual and threatened release of hazardous substances, including PCBs, into the plaintiff municipalities' drinking water supplies.

233. The actual or threatened release of PCBs into the municipal plaintiffs' drinking water supplies constitutes an imminent and substantial endangerment to public health and safety.

234. The 2002 ROD requires that EPA design and implement measures to protect public drinking water supplies from PCB contamination during dredging.

235. The 2002 ROD requires that the dredging project comply with state and federal water standards.

236. The 2002 ROD identified the New York State standard for protection of human

health and drinking water sources is 90 ng/L total PCBs (90 ppt).

237. Prior to dredging, testing of the Village and Town of Stillwater's water supply has shown PCB levels in excess of 90 ppt.

238. PCB levels in the water column of the Hudson River are anticipated to increase during dredging.

239. EPA has failed, and continues to fail, to design and implement measures to protect public drinking water supplies from PCB contamination during dredging.

240. EPA has failed, and continues to fail, to consider the persistence, toxicity, mobility and propensity to bioaccumulate of PCBs.

241. EPA has failed, and continues to fail, to consider the short and long-term potential for adverse health effects from human exposure to increased levels of PCBs.

242. EPA has failed, and continues to fail, to implement measures that utilize permanent solutions to address the long-term effects of PCB pollution of the plaintiffs' drinking water supplies.

243. EPA has failed, and continues to fail, to utilize the technologies to the maximum extent practicable to protect the plaintiffs' drinking water supplies from PCB contamination during dredging.

244. EPA has failed, and continues to fail, to articulate the technical feasibility of its proposed responsive measures.

245. EPA's failure to provide the Village and Town of Stillwater with an independent water supply prior to dredging constitutes unequal treatment, is arbitrary and capricious, and lacks any rational basis.

246. EPA's refusal to pay the Town of Waterford and Town of Halfmoon for increased

costs associated with obtaining water from the City of Troy for the entire period of dredging constitutes unequal treatment, is arbitrary and capricious, and lacks any rational basis.

247. Accordingly, plaintiffs seek injunctive relief staying the May 2009 Hudson River PCB Dredging Project until defendants provide all plaintiffs with an alternative water supply for the entire period of dredging, and compelling EPA and GE to comply with the ROD and protect the drinking water supplies of the municipal plaintiffs during the entire period of dredging.

248. Absent injunctive relief, plaintiffs have no adequate remedy at law to protect and enforce their rights, to protect the public health and welfare from an imminent and substantial endangerment from the actual or threatened releases of hazardous substances into plaintiffs' drinking water supplies, and shall suffer irreparable injury thereby.

249. As such the proposed dredging project should not be allowed to move forward until an adequate long-term water supply is provided to protect the plaintiff municipalities during dredging.

250. Based upon all of the foregoing, if injunctive relief is not granted staying the scheduled May 2009 start of dredging, plaintiffs will suffer irreparable harm.

251. Based upon all of the foregoing, the equities balance in plaintiffs' favor.

252. Based upon all of the foregoing, the grant of injunctive relief is in the public's best interests.

## SECOND CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – COST RECOVERY UNDER CERCLA § 107

253. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

254. Plaintiffs are each a "person" as that term is defined within the meaning of CERCLA §§ 101(21) and 107(a)(4)(B), 42 U.S.C. §§ 9601(21) and 9607(a)(4)(B).

255. Each of the General Electric Hudson Falls and Fort Edward capacitor manufacturing plants constitute a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

256. Defendant General Electric is the current and/or former owner and operator of the Hudson Falls and Fort Edward facilities, within the meaning of CERCLA § 107(a) and 101(20)(A), 42 U.S.C. §§ 9607(a) and 9601(20)(A).

257. Defendant has released PCBs into the environment, within the meaning of the terms "release" and "environment" as those terms are defined in CERLCA §§ 101(8) and 101 (22), 42 U.S.C. §§ 9601(8) and 9601(22), and/or "threatened release" of hazardous substances.

258. Such releases include, but are not limited to, PCBs discharged into the Hudson River from the Hudson Falls and Fort Edward facilities

259. The PCBs released, and threatened to be released, by defendant are hazardous substances as that term is defined by CERCLA § 101(14), 42 U.S.C. § 9601(14).

260. General Electric's release of PCBs into the Upper Hudson River has contaminated the municipal plaintiffs' property and drinking water supplies prior to dredging.

261. Upon information and belief, General Electric's release of PCBs into the Upper Hudson River shall continue to contaminate the municipal plaintiffs' property and drinking water supplies during and indefinitely after dredging.

262. The release or threatened release of PCBs into the upper Hudson River from General Electric's Hudson Falls and Fort Edward facilities entitles plaintiffs to recover necessary response costs, within the meaning of CERCLA §§ 101(25) and 107, 42 U.S.C. §§ 9601(25) and 9607.

263. Plaintiffs shall continue to incur necessary response costs to protect their property

and drinking water supplies from PCB contamination during and indefinitely after dredging.

264. The actions required to be taken by plaintiffs in responding to the release or threatened release of hazardous substances constitute response costs under CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B).

265. CERCLA expressly defines response actions as including the "provision of alternative water supplies," *Id.* §§ 101(23)(24), 42 U.S.C. §§ 9601(23)(24), including but not limited to drinking water and household water supplies." *Id.* § 101(34), 42 U.S.C. § 9601(34).

266. The costs suffered by plaintiffs in response to the release or threatened release of hazardous substances are necessary response costs consistent with the requirements of the National Contingency Plan.

267. Defendant General Electric is strictly liable for the past, present and future response costs incurred by plaintiffs in responding to the release of PCBs into their property and drinking water supplies.

268. The response costs include costs incurred by the plaintiffs in complying with the requirements and regulations of the New York State Department of Environmental Conservation, New York State Department of Health and other regulatory agencies.

**THIRD CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – STRICT LIABILITY**

269. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

270. Defendant General Electric's use, handling, storage, disposal and discharge of PCBs, PCB oils and/or electrical capacitors containing PCBs at the Hudson Falls and Fort Edward capacitor plants constitutes an abnormally dangerous, ultra hazardous and/or inherently or intrinsically dangerous activity for which defendant are strictly liable to plaintiffs under

common law.

271. As a direct and proximate result of the acts of said defendant, plaintiffs' property and drinking water supplies have been contaminated by PCBs, and plaintiffs have incurred substantial damages and anticipate incurring additional damages.

272. Defendant GE is liable to plaintiffs for all damages, costs and other losses, resulting directly and indirectly from the conduct complained of herein.

**FOURTH CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – NEW YORK STATE NAVIGATION LAW**

273. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

274. Defendant General Electric is a person who, through acts or omissions, has caused or contributed to the discharge of petroleum at the Hudson Falls and Fort Edward sites into the upper Hudson River, within the meaning of New York State Navigation Law §§ 172(8), 172(14) and 172(15).

275. The petroleum discharged by said defendant was contaminated with PCBs.

276. As a direct and proximate result of General Electric's acts and omissions, plaintiffs have incurred and shall continue to incur "cleanup and removal costs," as those terms are defined by New York State Navigation Law § 172(5).

277. Defendant GE is strictly liable, pursuant to Navigation Law §§ 181(1) and 181(5), for all direct and indirect damages sustained by plaintiffs as a result of defendant's discharge of PCB-contaminated petroleum, including the damages complained of herein.

**FIFTH CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – NEGLIGENCE (GROSS NEGLIGENCE)**

278. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated

herein.

279. Defendant General Electric owed plaintiffs a duty to use reasonable care in the use, handling, storage and disposal of hazardous substances, including PCBs, at the Hudson Falls and Fort Edward capacitor plants.

280. Defendant breached its duty of care in the use, handling, storage, disposal, discharge and release of PCBs into the environment and upper Hudson River.

281. Defendant owed plaintiffs a duty to use due care in their disposal of PCBs and defendant breached that duty by their acts and omissions.

282. As a direct and proximate result of defendant's acts and omissions, plaintiffs have been injured, and such injury was foreseeable.

283. Defendant is liable to plaintiffs for all direct and indirect damages, costs and other losses complained of herein.

284. Defendant GE knew or should have known, or consciously disregarded the hazards of PCBs, the hazards associated with improper disposal of PCBs, and the effect of such improper disposal of PCBs on plaintiffs.

285. Defendant consciously and deliberately released PCBs into the environment by improperly disposing of them.

284. Defendant consciously and recklessly failed to monitor PCBs disposed of at their respective facilities.

285. Defendant consciously and deliberately allowed PCBs to be released from their respective facilities with full understanding of the dangers and consequences thereof to plaintiffs.

286. In the alternative, defendant should have know of the damages and consequences of such disposal to plaintiffs.

287. Upon information and belief, defendant concealed the dangers posed by their improper disposal of PCBs and the release of those PCBs into the environment from the plaintiffs. With its superior knowledge, defendant had a duty of disclosure which it violated.

288. The aforementioned conduct constitutes gross negligence, recklessness and/or wantonness which has been and continues to be a direct and proximate cause and/or contributing cause of the damages and injuries sustained by plaintiffs.

289. The acts of defendant have been intentional, willful, wanton, illegal, and done with conscious and deliberate disregard for the rights of plaintiffs, the health and safety of their water users and customers, and, as a result of these acts of defendants, plaintiffs are entitled to punitive damages.

**SIXTH CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – PUBLIC NUISANCE**

290. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

291. Defendant General Electric's discharge and release of PCBs into the upper Hudson River has substantially interfered with the public's right to use and enjoy the municipal plaintiffs' property and drinking water supplies.

292. The contamination of the plaintiffs' municipal property and drinking water supplies constitutes a public nuisance that is a continuing and substantial threat to public health and welfare.

293. Defendant General Electric through its acts and omissions created, participated in and/or contributed to the public nuisance by discharging PCBs from its Hudson Falls and Fort Edward plants into the Upper Hudson River.

294. Defendants' conduct as described above was intentional, unreasonable, negligent

and/or abnormally dangerous in nature

295. Defendant has failed to abate the public nuisance at their plants and plaintiffs' property and drinking water supplies.

296. As a direct and proximate result of the public nuisance described herein, plaintiffs have been injured.

297. Defendant is liable to plaintiffs under the common law of public nuisance and pursuant to the New York Real Property Law and Proceedings § 841 for the creation and maintenance of a public nuisance at and around their facilities and within plaintiffs' property and drinking water supplies.

298. Plaintiffs seek all direct and indirect damages complained of herein, together with injunctive relief to abate such nuisance and/or for all costs of plaintiffs in abating the same.

**SEVENTH CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – PRIVATE NUSIANCE**

299. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

300. Defendant's discharge and release of PCBs into the upper Hudson River has substantially interfered with the plaintiffs' rights to use and enjoyment of their property and drinking water supplies.

301. Defendants' conduct as described above was intentional, unreasonable, negligent and/or abnormally dangerous in nature.

302. As a direct and proximate result of the private nuisance described herein, plaintiffs have been injured.

303. Defendant is liable to plaintiffs under the common law of public nuisance and pursuant to the New York Real Property Law and Proceedings § 841 for the creation and

maintenance of a private nuisance at and around their facilities and plaintiffs' property and drinking water supplies.

304. Plaintiffs seek all direct and indirect damages complained of herein, together with injunctive relief to abate such nuisance and/or for all costs of plaintiffs in abating the same.

**EIGHTH CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – TRESPASS**

305. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

306. Plaintiffs at all relevant times, owned and operated their respective municipal drinking water supplies.

307. Defendant General Electric's discharge and release of PCBs into the upper Hudson River has caused unauthorized and wrongful invasion and trespass of contamination of plaintiffs' property and drinking water supplies.

308. The invasion and trespass of PCBs has substantially and wrongfully interfered with the plaintiffs' use and enjoyment of their property and drinking water supplies.

309. Upon information and belief, the unauthorized and wrongful invasion and trespass of PCB contamination of plaintiffs drinking water supplies continues at this time and is anticipated to occur again in the future.

310. Defendant's complained of conduct was intentional, willful and otherwise negligent whereby defendant knew or should have known that the PCBs discharged at the Hudson Falls and Fort Edward facilities directly and/or indirectly into the upper Hudson River, would migrate and contaminate the plaintiffs' drinking water supplies.

311. As a direct and proximate result of defendant's acts and omissions, plaintiffs have been injured.

312. Defendant is liable to plaintiffs for all direct and indirect damages, costs and other losses complained of herein.

**NINTH CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST GE – EQUITABLE INDEMNITY/RESTITUTION**

313. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

314. Defendant General Electric is liable to plaintiffs for all damages, expenses and costs incurred by plaintiffs as the direct and proximate result of the PCB contamination of their property and drinking water supplies.

315. Wherefore, plaintiffs seek indemnification and restitution from defendant.

**TENTH CAUSE OF ACTION BY ALL PLAINTIFFS AGAINST EPA AND GE – DECLARATORY JUDGMENT**

316. Plaintiffs incorporate by reference all of the paragraphs above, as if fully restated herein.

317. An actual controversy exists between plaintiffs and defendants EPA and GE concerning the parties' respective obligations and potential legal liabilities in connection with actual and/or threatened PCB contamination of their municipal properties and public water supplies, which constitutes an imminent and substantial endangerment to public health and welfare and shall result in response costs, cleanup and removal costs, direct and indirect damages, and other losses which have been incurred and will be incurred by plaintiffs, including but not limited to loss of use; impairment of value; investigation; monitoring; testing; remediation costs and/or obtaining alternative drinking water supplies; loss of revenue from the sale of water; and other damages associated with providing drinking water to plaintiffs' water users and customers, together with damages related to the capital investment and improvement of

their water supply, treatment and distribution systems, compliance with regulations and orders of the New York State Department of Environmental Conservation and New York State Department of Health, and potential civil penalties and other costs of regulatory enforcement.

318. Absent judicial declaration settling the parties' rights and obligations of the aforesaid claims, a multiplicity of suits may result.

319. Accordingly, plaintiffs seek a declaration that defendants are liable and subject to the relief demanded herein and judgment granting injunctive relief in the form of prohibition staying the May 2009 dredging until defendants provide all plaintiffs with an alternative water supply for the entire period of dredging.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand relief against defendants as follows:

1. Injunctive relief staying the announced May 2009 commencement of the Hudson River PCB Dredging Project until defendants provide all plaintiffs with an alternative water supply for the entire period of dredging;

2. Compelling EPA and GE to comply with the ROD to protect the drinking water supplies of the municipal plaintiffs during the entire period of dredging;

3. Declaratory relief adjudicating the legal rights and obligations of the parties;

4. Compensatory damages in an amount to be determined upon trial;

5. Punitive damages in an amount to be determined upon trial; and

6. Attorneys fees, disbursements and costs; and

7. Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: Albany, New York
February 25, 2009

**DREYER BOYAJIAN LLP**

s/
___________________________________
Donald W. Boyajian, Esq. (Bar Roll # 101196)
Craig M. Crist, Esq. (Bar Roll # 508143)
James R. Peluso, Esq. (Bar Roll # 105634)
*Attorneys for Plaintiffs Village of Stillwater, Town of Stillwater, Town of Waterford, Water Commissioners of the Town of Waterford, Village of Waterford and County of Saratoga*
75 Columbia Street
Albany, NY 12210
Telephone: (518) 463-7784

**LAW OFFICE OF ROBERT J. CHAUVIN**

s/
___________________________________
Robert J. Chauvin, Esq. (Bar Roll # 501090)
*Attorneys for the Town of Halfmoon*
661 Plank Road
Clifton Park, NY 12065
Telephone: (518) 371-5010