**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

VILLAGE OF STILLWATER; TOWN OF STILLWATER; TOWN OF WATERFORD; WATER COMMISSIONERS OF THE TOWN OF WATERFORD; VILLAGE OF WATERFORD; TOWN OF HALFMOON; and COUNTY OF SARATOGA,

        Plaintiffs,

v.                No. 09-CV-228
                  (DNH/DRH)

GENERAL ELECTRIC COMPANY,

        Defendant,

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| DREYER BOYAJIAN, LLP<br>Attorneys for Stillwater, Waterford and<br> Saratoga county Plaintiffs<br>75 Columbia Street<br>Albany, New York 12210 | DONALD W. BOYAJIAN, ESQ.<br>JAMES R. PELUSO, JR., ESQ.<br>CRAIG M. CRIST, ESQ. |
| NOLAN & HELLER, LLP<br>Attorney for Plaintiffs Town of Halfmoon<br>39 North Pearl Street, 3rd Floor<br>Albany, New York 12207 | DAVID A. ENGEL, ESQ.<br>SHANNAN COLLIER KRASNOKUTSKI,<br> ESQ. |
| WILLIAMS & CONNOLLY, LLP<br>Attorneys for Defendant<br>725 Twelfth Street, N.W.<br>Washington, D.C. 20005-5901 | STEVEN R. KUNEY, ESQ.<br>WILLIAM J. BACHMAN, ESQ.<br>CONSTANCE FORKNER, ESQ. |
| SHERI L. LITTLEFIELD-MORENO, ESQ.<br>General Electric Company-Corporate<br> Environmental Programs<br>Attorney for Defendant<br>319 Great Oaks Boulevard<br>Albany, New York 12203 | |

**DAVID R. HOMER
U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**

Plaintiffs the Village of Stillwater, Town of Stillwater, Town of Waterford, Water Commissioners of the Town of Waterford, Village of Waterford, Town of Halfmoon, and County of Saratoga ("Plaintiffs") brought this action against General Electric Company ("GE") alleging violations under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., New York Navigation Laws, and the New York common law of negligence, nuisance, and trespass alleging that GE polluted their water supplies.  Compl. (Dkt. No. 1).  Presently pending is GE's motion for reverse bifurcation of the litigation.  Dkt. No. 41.  Plaintiffs oppose the motion.  Dkt. Nos. 47, 52.  For the following reasons, GE's motion is denied.

**I.  Background**

GE owned and operated two facilities in Hudson Falls and Fort Edward, both of which are located next to the Hudson River.  Compl. ¶¶ 17-18; Answer (Dkt. No. 9) ¶¶ 17-18.  For approximately thirty years, GE used, stored, and disposed of Polychlorinated Biphenyls ("PCBs") at these sites.  Compl. (Dkt. No.1) ¶¶ 23-24; Answer ¶¶ 23-24.  PCBs constitute hazardous materials.  Compl. ¶¶ 20-21; Answer ¶¶ 20-21.  GE's use of PCBs at these sites resulted in the release of PCBs into the environment, which included the ground water and water at, in, and adjacent to the Hudson River.  Compl. ¶ 24; Answer ¶ 24.  Once discharged, the PCBs adhered to river sediment and settled downstream.  Compl. ¶ 36; Answer ¶ 36.  PCBs have been found as far downstream as the New York City harbor, approximately 150 miles south of the GE facilities.  Compl. ¶ 37; Answer ¶ 37.  These two

facilities were the principal sources of PCBs in the upper Hudson River.  Compl. ¶¶ 34, 38; Answer ¶¶ 34, 38.

Plaintiffs contend that their drinking water supplies were contaminated by GE's release of PCBs into the upper Hudson.  Compl. ¶ 40.  Plaintiffs are all located adjacent to the Hudson River and draw water from the river at an area downstream from the Hudson Falls and Fort Edward plants.  Testing on plaintiffs' water supplies indicated there were PCBs present in the drinking water in 2008.  Comp. ¶¶ 104-09, 112, 127-28, 147.  It is undisputed that GE's use, storage, and disposal of the PCBs at their industrial sites led to measurable amounts of PCBs in the soil and groundwater, but GE denies that this resulted in contamination of the water column, water supply, or soil.  Id. ¶¶ 25-26, 29-30, 38; Answer ¶¶ 25-26, 29-30, 38.

In 2009, GE began a remedial dredging program, under the supervision of the Environmental Protection Agency ("EPA"), to remove the PCBs from the upper Hudson river area.  Engel Decl. (Dkt. No. 48) ¶¶ 6-7; Dkt. No. 51, Ex. 3.[1]  Plaintiffs contended that this dredging would increase the amount of PCBs in the river sediment and further contaminate their water supplies.  Compl. ¶¶ 111, 136-37, 152-53.  During the dredging process, plaintiffs had arranged to receive their water supply from an alternate source, intending to resume production from their own water treatment plants once the dredging ceased.  Engel Decl. ¶ 17.

The dredging released over twenty-five times more PCBs into the upper Hudson than

---

[1] Phase I of the dredging project has been completed.  Dkt. No. 51, Ex. 3. However, a second phase is contemplated to begin in the near future and dredge a larger area of the Hudson river.  Id.

3

was originally contemplated and the "drinking water standard of 500 parts per trillion was exceeded [ten] times." Dkt. No. 51, Ex. 3 at 5.  After dredging concluded, the plaintiffs found increased PCB levels in their water supplies which resulted in their obtaining water from other sources.  Engel Decl. ¶¶ 19-20, 22.  GE denied that its PCB discharge was the direct or proximate cause of the drinking water contamination or that its dredging would result in further contamination to the municipalities' water supplies or property.  Compl. ¶¶ 40, 42, 260-61; Answer ¶¶ 40, 42, 260-61.  The benefits from the dredging project may not be realized until after 2050.  Dkt. No. 51, Ex. 7.

## II. Discussion

The Federal Rules provide that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues . . . ." Fed. R. Civ. P. 40(b).  The district court retains the discretion to decide whether such separation is appropriate.  See, e.g., Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 283 (2d Cir. 1990) (citations omitted).  Bifurcation is one such remedy.  "The three allowable grounds for a bifurcation decision – furthering convenience, avoiding prejudice and furthering expedition and economy – are set out in the alternative, so that the presence of any one is sufficient to sustain such an order." Simon v. Philip Morris Inc., 200 F.R.D. 21, 27 (E.D.N.Y. 2001) (citations omitted); see also Lewis v. City of New York, 689 F. Supp. 2d 417, 429 (E.D.N.Y. 2010) ( "On a case-by-case basis, courts should examine, among other factors, whether bifurcation is needed to avoid or minimize prejudice, whether it will produce economies in the trial of the matter, and whether bifurcation will lessen or eliminate the likelihood of juror confusion.") (citations omitted).  "The drafters of [the] Rule . . . commented that while

separation of issues for trial is not to be routinely ordered, it is important that it be encouraged where experience has demonstrated its worth." Simon, 200 F.R.D. at 27 (internal quotation marks and citations omitted); see also Dallas v. Goldberg, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001) ("Although bifurcation of trials is not unusual and may under appropriate circumstances be the preferred method, bifurcation remains the exception rather than the rule.") (citing cases).

"Bifurcation procedure has evolved to accommodate the modern emphasis on active judicial management of complex cases, particularly in the realm of mass tort disputes." Simon, 200 F.R.D. at 32 (citing cases and law review articles); see also Angelo v. Armstrong World Indus., Inc., 11 F.3d 957, 963 (10th Cir. 1993) (noting that reverse bifurcation is "commonly used . . . in asbestos cases.") (citing cases); Walker Drug Co., Inc. v. La Sal Oil Co., 972 P.2d 1238, 1245 n.7 (Utah 1998) ("[R]everse bifurcation is much less common and has been used only rarely in complex asbestos-related litigation."). "Reverse bifurcation, trying damages before liability . . . [may be appropriate] where the parties have excellent information about the likelihood of success on the issue of liability and the real sticking points are the individual issues of causation and damages." Simon, 200 F.R.D. at 32 (internal quotation marks and citations omitted).

However, "[p]iecemeal litigation is not favored and bifurcation is inappropriate in cases where the facts are so inextricably interwoven that separation is impossible or at least manifestly unfair." ABB Indus. Sys., Inc. v. Prime Tech., Inc., 32 F. Supp. 2d 38, 43 (D. Conn. 1998) (internal quotation marks and citations omitted); see also Katsaros v. Cody, 744 F.2d 270, 278 (2d Cir. 1984) ("Bifurcation of the trial . . . was reasonable because the two phases involved different types of evidence."); In re Paoli R.R. Yard PCB Litigation,

5

113 F.3d 444, 452 n.5 (3d Cir. 1997) (explaining that "[t]he Seventh Amendment requires that, when a court bifurcates a case, it must divide issues between separate trials in such a way that the same issue is not reexamined by different juries.") (citations omitted).

In this case, reverse bifurcation is not supported for multiple reasons. First, it appears that issues of liability, damages, and causation are inextricably intertwined in significant respects. It is undisputed that to prove a CERCLA claim in the present case, plaintiffs must demonstrate that (1) the defendant falls within the statute; (2) the site in question qualifies as a facility; (3) the facility released hazardous substances; (4) as a result of such a release the plaintiffs' incurred response costs; and (5) those costs conformed to the National Contingency Plan. Anspec Co., Inc. v. Johnson Controls, Inc., 788 F. Supp. 951, 955 (E.D.Mi 1992) (citations omitted); see also Town of Oyster Bay v. Occidental Chem. Corp., 987 F. Supp. 182, 194 (E.D.N.Y. 1997) (citations omitted). It has been held that

> a prima facie case under CERCLA requires proof of what is typically a liability issue (such as who arranged for disposal of hazardous substances at the site) and proof of what is typically a damage issue (what were plaintiffs' costs and were they reasonable); the liability and damage issues are inextricably intertwined under the statutory scheme.

Anspec Co., Inc., 788 F. Supp. at 955; see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 131-32 (2d Cir. 2010) (explaining that CERCLA proceedings are generally bifurcated determining liability first and damages second because the liability discussion with regard to causation, is rather limited, but, "when damages are apportioned . . . the relative strength of the evidence of liability becomes a relevant factor . . . [evaluating] causation . . . through the backdoor . . . ." and commenting that in this analysis courts "use their broad discretion . . . including consideration of the quality of the evidence that lead to

6

liability.") (citations omitted).  As such, there are overlapping issues with regard to causation, liability, and damages.  Moreover, with GE proposing to proceed with damages before liability, evidence of causation will necessarily be relevant in both trials and thus lead to an overlap of issues.

Additionally, elements of plaintiffs' claims of nuisance, trespass, and negligence are also intertwined. Based on a New York case, GE has proffered that this is an inappropriate argument because, with regard to nuisance and trespass claims, there will only be "some minimal overlap between liability and damages, [thus] the liability standards . . . are severable from the proof of specific damages . . . both for discovery and trial purposes." Raiport v. Gowanda Electronics Corp., 739 N.Y.S.2d 811, 813 (N.Y. Sup. Ct. 2001).

> Generally, liability will focus primarily on the history of the activity on the site, the nexus to the actual contamination of groundwater in the area, the degree of knowledge and wilfulness of the defendants and the extent to which the activities were dangerous and hazardous. In contrast, discovery on damages will have to measure the exact effect of the migrant contamination on each and every property and a calculation of the effect on each plaintiff's future health. In this respect, the legal threshold for liability here, and the discovery required to prove it, falls far short of the specific proof required for damages, while still giving a general indication of potential damages on which to base more productive settlement discussions. Therefore, demonstrating liability and investigating the specific extent of damages to each plaintiff are not so inextricably intertwined as to preclude bifurcation.

Id.

However, in the Raiport case, the contamination occurred in the 1930s and there was no additional action taken after that initial contamination which allegedly furthered the damages.  Id. at 812.  This case is distinguishable.  It is undisputed that between the 1940s and 1970s GE used, stored, and disposed of PCBs at its facilities.  The extent to which

7

these actions contaminated the current water supplies are disputed as in Raiport. In 2009 GE devised, implemented, and completed a dredging project resulting in an indisputable increase in the PCB levels of the water supplies and a GE prediction that no appreciable improvement in the quality or safety of the water would occur before 2050. Thus, there exists here a factual dispute regarding GE's knowledge of the quality and characteristics of the PCBs both historically and at present which is relevant to all aspects of causation and in both the liability and damages phases. This distinguishes this case from Raiport and indicates that bifurcation is inappropriate here.

Furthermore, reverse bifurcation will not serve judicial economy. First, reverse bifurcation has been characterized as uncommon and most effective in highly complex mass tort cases. This is not such a case. There is only one defendant and four municipal entities. See Voggenthaler v. Maryland Square, LLC, No. 08-CV-1618 (RCJ/GWF), 2010 WL 1553417, at *10 (D. Nev. April 14, 2010) (denying bifurcation in a trial which did "not present the complex factual background involved in the normal clean-up action . . . [as t]he defendants are only two, and they have agreed to act as a single defendant for purposes of this action."); In re Richardson-Merrell, Inc. Bendectin Prods. Liability Litig., 624 F. Supp. 1212, 1221 (S.D. Ohio 1985) (ordering bifurcation where there were over 1000 cases which, if tried separately, were each expected to last one month resulting in "a substantial number of the District Judges in this country . . . do[ing] nothing for a year but try[ing] Bendectin cases," resulting in unfairness to plaintiffs who may have to "wait years or even decades for their cases to be heard."); In re New York City Asbestos Litig., 593 N.Y.S.2d 43 (1st Dep't 1993) (ordering bifurcation where asbestos action involved approximately 600 plaintiffs). Accordingly, the present case does not involve the number of litigants with

attendant logistical complexities for which reverse bifurcation has been ordered.

Second, reverse bifurcation would not reasonably result in an early conclusion to the litigation. General Elec. Credit Union v. Nat'l Fire Ins. of Hartford, No. 09-CV-143, 2009 WL 3210348, at *5 (S.D. Ohio Sept. 30, 2009) ("Additionally, delaying discovery and further extending this litigation, on the mere possibility that the resolution of the coverage issues may preclude Plaintiff's bad faith claim, does not operate to conserve the resources of the parties or this Court.") (citations omitted).  GE's suggestion that an early determination of damages would facilitate settlement is illusory where the parties's settlement discussions to date reveal severe differences over the value of plaintiffs' claims.  GE appears to assume that its view of damages would prevail and that, having prevailed, plaintiffs would then be forced to accept GE's position.  While GE's confidence in the outcome is admirable, its assumption lacks credible foundation.

Third, GE's proposal is actually not merely bifurcation but trifurcation.  First, discovery and trial would be held on damages.  Then, discovery and trial would proceed on liability, including whether plaintiffs should be awarded punitive damages.  Finally, if punitive damages are awarded, discovery and trial would then be held on the amount of punitive damages.  Given the periods of time required for each separate trial, it appears that separate juries would determine the issues in the different phases.  Moreover, each phase is likely to experience additional delay beyond the time required for discovery and motions at each stage by interlocutory appeals, or litigation regarding motions for leave to pursue such appeals.  In short, the cumbersome procedures proposed here will more likely extend the litigation and increase the costs to the parties and the Court rather than compress and reduce them.

Fourth, the bifurcation proposed here will result in multiple discovery phases, including accompanying confusion and disputes over which evidence is most appropriately discoverable for which stages. General Elec. Credit Union, 2009 WL 3210348, at *5 ("[B]ifurcating these claims and delaying discovery until after the conclusion of the coverage claim could well result in unnecessary duplication, delay, and expense and does not serve the interest of judicial economy.") (internal quotation marks and citations omitted); United States v. Dravo Corp., No. 01-CV-500, 2002 WL 1832274, at *4 (D. Neb. Mar. 6, 2002) (denying motion for bifurcation based on promoting convenience and efficiency due to decreased discovery because "[s]uch would be true only if the defendants prevail on the . . . first phase . . .; otherwise , the plaintiff and the court will go through another discovery process and trial on the second and third phases . . . ."); ABB Indus. Sys., Inc. v. Prime Technology, Inc., 32 F. Supp. 2d 38, 44 (D. Conn. 1998) (denying bifurcation of CERCLA claim for multiple reasons including fact that "reserving a second phase solely for allocation of damages – rather than resolving all the issues in one trial – would seem to unnecessarily prolong the litigation where one is not faced with a multitude of responsible defendants.").

Finally, bifurcation would severely prejudicial to plaintiffs here. In allowing GE to litigate damages, prior to liability, such a reverse presentation runs the risk of potential juror confusion. Bendectin Prods., 624 F. Supp. at 1221 (holding that bifurcation "may deprive plaintiffs of their legitimate right to place . . . the circumstances and atmosphere of the entire cause of action . . . replacing it with sterile or laboratory atmosphere in which causation is parted from the reality of injury," and should be rejected "[*i*]*n litigation of lesser complexity* . . . .") (citations omitted) (emphasis in original); State ex rel. Atkins v. Burnside, 569 S.E.2d 150, 161 (W. Va. 2002) (denying reverse bifurcation on grounds that it "would

[not] permit the parties [the opportunity] to present evidence in an organized and effective order.").

Thus, the reverse bifurcation proposed by GE is inappropriate in this case given the limited number of parties, would increase the time and expense of the litigation rather than deceasing them, would decrease rather than increase judicial efficiency and expense, and would severely and unfairly prejudice plaintiffs.  Accordingly, GE's motion for reverse bifurcation is denied because it does not comport with any of the aims of the federal rules.

### III. Conclusion

For the reasons stated above, it is hereby **ORDERED** that GE's motion for reverse bifurcation (Dkt. No. 41) is **DENIED**.


Dated: October 13, 2010
       Albany, New York
                                                       *David R. Homer*
                                           United States Magistrate Judge