UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TOWN OF HALFMOON and COUNTY OF
SARATOGA,

                Plaintiffs,

    -v-                              1:09-CV-228 (LEAD)

GENERAL ELECTRIC COMPANY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SARATOGA COUNTY WATER AUTHORITY,

                Plaintiff,

    -v-                              1:11-CV-6 (MEMBER)

GENERAL ELECTRIC COMPANY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                    OF COUNSEL:

NOLAN & HELLER, LLP             DAVID A. ENGEL, ESQ.
Attorneys for Plaintiff Town of Halfmoon   SHANNAN COLLIER
39 North Pearl Street                KRASNOKUTSKI, ESQ.
Albany, NY  12203

DREYER BOYAJIAN LLP           CRAIG M. CRIST, ESQ.
Attorneys for Plaintiffs Saratoga County and  DONALD W. BOYAJIAN, ESQ.
   Saratoga County Water Authority     JAMES R. PELUSO, JR., ESQ.
75 Columbia Street                 BENJAMIN W. HILL, ESQ.
Albany, NY  12210                WILLIAM J. DREYER, ESQ.

MACKENZIE HUGHES LLP          SAMANTHA L. MILLIER, ESQ.
Attorneys for Defendant General Electric Co.
101 South Salina Street
Syracuse, NY  13221

WILLIAMS & CONNOLLY LLP                    NEELUM J. WADHWANI, ESQ.
Attorneys for Defendant General Electric Co.   ROBERT J. SHAUGHNESSY, ESQ.
725 12th Street, NW                        STEVEN R. KUNEY, ESQ.
Washington, DC  20005                      CONSTANCE T. FORKNER, ESQ.
                                           JOSEPH G. PETROSINELLI, ESQ.


DAVID N. HURD
United States District Judge


## TABLE  OF  CONTENTS

TABLE OF ABBREVIATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.  FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

III.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
       A.  Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
       B.  Plaintiffs' Motions for Partial Summary Judgment. . . . . . . . . . . . . . . . . . . . . . .  11
             1.  CERCLA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
                   a.  Costs Related to Remedial Measures. . . . . . . . . . . . . . . . . . . . . . .  13
                   b.  Necessary Costs of Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
                   c.  Compliance with the NCP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
             2.  State Claims—Doctrine of Conflict Preemption. . . . . . . . . . . . . . . . . . . . .  24
             3.  New York Navigation Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
       C.  GE's Motions for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
             1.  CERCLA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
             2.  New York Navigation Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
       D.  Future Course of the Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
             1.  Liability Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
             2.  Damages Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

# TABLE OF ABBREVIATIONS

CERCLA:     Comprehensive Environmental Response, Compensation, and Liability Act
EPA:        United States Environmental Protection Agency
GE:         General Electric Company
NCP:        National Contingency Plan
NYDEC:      New York State Department of Environmental Conservation
PCBs:       Polychlorinated Biphenyls
ppt:        parts per trillion
ROD:        Record of Decision
SCWA:       Saratoga County Water Authority

# MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

The Town of Halfmoon ("Halfmoon") and the County of Saratoga ("the County") initiated this action against defendant General Electric Company ("GE") on February 25, 2009.[1] On February 15, 2011, this case was consolidated with a related case filed by the Saratoga County Water Authority ("SCWA") against GE on January 4, 2011. This consolidated action arises from the release of Polychlorinated Biphenyls ("PCBs") into the Hudson River from two GE facilities in upstate New York.

In their respective complaints, plaintiffs assert the following causes of action against GE: (1) A claim seeking injunctive relief staying the dredging project, which began in 2009 and is in progress ("First Cause of Action"); (2) a cost recovery claim pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675 ("CERCLA") ("Second Cause of Action"); (3) a strict liability claim ("Third Cause of Action"); (4) a claim pursuant to New York Navigation Law ("Fourth Cause of

---

[1] Several other municipal plaintiffs and federal defendants were originally involved in this matter but have since been terminated.

Action"); as well as claims for (5) negligence/gross negligence ("Fifth Cause of Action"); (6) public nuisance ("Sixth Cause of Action"); (7) private nuisance ("Seventh Cause of Action"); (8) trespass ("Eighth Cause of Action"); equitable indemnity/restitution ("Ninth Cause of Action"); and for declaratory judgment ("Tenth Cause of Action"). During the course of the litigation, plaintiffs have stipulated to the dismissal of the First and Tenth Causes of Action.

The parties have completed extensive discovery and have filed numerous motions. Currently pending are the County and SCWA's motion for partial summary judgment on the liability of GE; Halfmoon's motion for partial summary judgment on the liability of GE; GE's motion for summary judgment against the County and SCWA; and GE's motion for summary judgment against Halfmoon.[2] These motions have been fully briefed, and oral argument was heard on December 16, 2014, in Utica, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

Unless otherwise noted, the following pertinent facts are undisputed. GE owned and operated two capacitor manufacturing plants located along the Hudson River in Hudson Falls and Fort Edward, New York. GE used, stored, and disposed of PCBs at these two facilities between 1947 and 1977.[3] The United States Environmental Protection Agency ("EPA") issued permits to GE allowing it to discharge PCBs from the two plants in the mid-1970s. GE exceeded the maximum amount of PCB discharge permitted by state law at least once, in

---

[2] In addition, GE has filed a motion to preclude Halfmoon's claim for replacement cost damages; the County and SCWA and Halfmoon have each filed a motion in limine seeking to preclude a total of seven of GE's experts; and GE has filed five motions in limine seeking to preclude five of plaintiffs' experts. These motions have been fully briefed and will be addressed in due course as appropriate in light of the rulings made on the motions for summary judgment herein. This Memorandum–Decision and Order will only address and resolve the four pending motions for summary judgment.

[3] Specifically, GE used, stored, and disposed of PCBs at the Hudson Falls plant between 1952 and 1977, and at the Fort Edward plant between 1947 and 1977.

1976.  In 1977, the Toxic Substances Control Act, 15 U.S.C. §§ 2601–2697, generally

prohibited the manufacture and sale of PCBs.

The EPA has established a maximum containment level for PCBs in drinking water of

500 parts per trillion ("ppt").  The New York State Department of Health has similarly

established 500 ppt as the standard for protecting human health with regard to PCBs in

drinking water.  The New York State Department of Environmental Conservation ("NYDEC")

established a water quality standard PCB level of 90 ppt for drinking water sources.

The use, storage, and disposal of PCBs at the two GE plants ultimately resulted in the

release of PCBs into the Hudson River and the groundwater, surface water, air, and soil

adjacent to the plants.[4]  The EPA designated a 200-mile section of the Hudson River as a

Superfund Site.  This site is divided into:  (1) The Upper Hudson River, stretching from

Hudson Falls to Troy, New York; and (2) the Lower Hudson River, stretching from Troy to the

Battery in New York City.  Contaminated sediment from GE's discharge is a predominate

source of PCBs in the water column in the Upper Hudson River.

A 1984 EPA study of the affected area yielded an interim "no action" recommendation

due to then-existing technology's uncertain ability to remediate the contaminates.  The EPA

continued to reassess the matter.  In 1990, the County commissioned Clough Harbor &

Associates to complete an intermunicipal water study, which analyzed population trends,

water demands, and potential plans for the provision of water to municipalities within the

County.  The study was updated in 1995 to incorporate changes in municipal water systems

throughout the County.  These studies formed a tentative "master plan" that identified the

_____

[4] The parties dispute when the majority of the PCBs were released as well as the extent, impact, and
continued contamination stemming from such release.

Upper Hudson River as the primary source for the County's drinking water.  The studies

identified a site in the Town of Moreau as a potential area to establish a water source intake.

In 2000, the EPA proposed a plan to remediate the river sediments in the affected

area through dredging.  GE initially opposed the dredging, warning it would "resuspend" the

PCBs in the water and cause increased contamination.  Nonetheless, the EPA issued a

Record of Decision in 2002 calling for the dredging and removal of contaminated sediment

from the Upper Hudson River ("the 2002 ROD").  The 2002 ROD contemplated a two-phase

project, estimated to take over six years to complete—one year for Phase 1 and five years

for Phase 2.

In 2002 Clough Harbor & Associates performed another review—updating the 1990

and 1995 water studies—regarding the provision of drinking water to municipalities in the

County.  According to plaintiffs, this study accounted for potential environmental impacts of

the planned dredging project and recommended using the Moreau site to access the Upper

Hudson River in order to avoid downstream contaminates in the proposed dredging site.  The

parties dispute the amount of consideration actually given to alternative sources—aside from

the Moreau site—and the reasoning behind SCWA's choice of that site (i.e. whether the

threat of resuspended PCBs from the dredging process was a factor in the decision to utilize

the Moreau site).

In October 2005 the United States filed a complaint in the Northern District of New

York seeking injunctive relief and recovery and response costs from GE.  The EPA and GE

negotiated and signed a Consent Decree, which this Court approved in November 2006.

See United States v. Gen. Electric Co., 460 F. Supp. 2d 395 (N.D.N.Y. 2006), aff'd, Town of

Fort Edward v. United States, No. 06-5535-CV, 2008 WL 45416 (2d Cir. 2008).  In the

Consent Decree GE agreed to perform Phase 1 of the dredging project, but could opt out of Phase 2 under certain conditions. Pursuant to CERCLA, the Consent Decree exempted GE from obtaining federal, state, or local permits to build and operate the "on-site" processing facility.

Beginning in 2006, plaintiffs and GE initiated discussions and studies regarding possible alternative sources of drinking water to be used by Halfmoon and the County, as well as other municipalities no longer involved in this action, during Phase 1 of the dredging project. A November 2006 ruling by EPA found, over GE's objections, that the provision of such alternative water sources was consistent with the 2002 ROD and was needed "to protect the community from the potential hazard of consuming water that contains elevated levels of PCB as a result of the dredging." Boyajian Decl., Ex. 28, ECF No. 201-30, at 4.

The County retained Malcolm Pirnie, Inc. as a consultant and eventually applied for permission to develop a raw water source at the Moreau site. In December 2006 the NYDEC issued a water supply permit to the County for a water intake on the Hudson River in Moreau. The County subsequently transferred its interest in the Moreau water system project to the SCWA. In 2008 the SCWA issued $44,900,000 million in revenue bonds and received several grants to fund this project.

In February 2009, GE issued a Phase 1 Remedial Action Community Health and Safety Plan, which identified potential hazards that the dredging project would present to the local community. It also noted that an alternative water supply would be provided to the residents of Halfmoon by constructing a water line to the City of Troy's water supply. Pursuant to a March 2009 modification to the Consent Decree, GE agreed to pay the EPA seven million dollars toward the design and construction of said water line. Halfmoon began

purchasing and using water from Troy on May 14, 2009.[5]  The EPA established "Water Supply Decision Criteria" to identify when EPA would reimburse Halfmoon for its increased costs of purchasing water from Troy.[6]

Phase 1 of the Upper Hudson River dredging project was conducted between May 15 and October 27, 2009.  All backfilling and restoration operations concluded on December 4, 2009.  Halfmoon resumed supplying its residents with drinking water from its own water treatment plant on December 9, 2009.  The SCWA water system project, with an intake at the Moreau site, was completed and began supplying customers in February 2010.  Also in 2010, various studies were conducted regarding the success and impact of the Phase 1 dredging.  The parties agree that the dredging resuspended PCBs into the water column, caused a "redeposit" of PCBs further downstream from the dredging site, and released oil sheens on the river.[7]  However, they dispute the levels of PCBs in the water and the overall quality of the water.

Plaintiffs claim the dredging released over twenty-five times more PCBs than originally contemplated, and they report that the 500 ppt standard was exceeded ten times.  They also claim the "7-day running average net PCB load of 1080 g/day" was exceeded on 152 of 166 days during Phase 1.  Moreover, they report that water column measurements at the Thompson Island station in March and April 2010 revealed PCB concentrations generally

_____

[5] Halfmoon had previously supplied its residents with drinking water produced by its own water treatment plant, which drew water from the Hudson River.

[6] This scheme provides for the reimbursement of Halfmoon's incremental costs during dredging if: (1) The level of PCBs in the river exceeds 500 ppt at any far-field monitoring station; or (2) there is insufficient time to provide Halfmoon with at least four hours advance notice prior to the arrival of potentially contaminated water in the supply.

[7] Water samples taken while sheens were observable indicated PCB concentrations ranging from 2210 to 393,000 ppt.

ranging between 500 and 2500 ppt and peaking at 13,700 ppt on March 25, 2010.  Halfmoon received notification of a "High Flow Event" on March 26, 2010.  As a result, Halfmoon stopped using its water treatment plant and switched back to the water supply line from Troy, which it has been using ever since.

Conversely, GE reports that the resuspension rate of PCBs during Phase 1 was three or four percent, which is consistent with other dredging projects.  GE also claims the 500 ppt standard was only exceeded three times during dredging, and it questions the reliability of PCB readings at the Thompson Island station.

Phase 2 of the dredging project commenced in May 2011 and again resulted in the resuspension of PCBs into the water column and downstream from the dredging activity.  In September 2011, the EPA and Halfmoon entered into an agreement through which the EPA continues to reimburse Halfmoon for incremental costs of using Troy's water supply during the dredging seasons.  Specifically, the EPA agreed to pay such costs incurred from March 26, 2010, through the end of the 2012 dredging season, and during all dredging seasons thereafter.  Phase 2 is expected to be complete in 2015.

## III.  DISCUSSION

Generally, plaintiffs claim they are entitled to recover the costs stemming from the water system project at the Moreau site (the County and SCWA) and the usage of the City of Troy's water supply (Halfmoon).[8]  Specifically, the County and SCWA claim that but for the

---

[8]  Halfmoon also seeks a variety of other damages, including punitive damages.  It allegedly suffered economic losses because the dredging prevented it from selling drinking water from its own water treatment plant to other communities.  GE claims there is no evidence that Halfmoon ever sold or planned to sell water to anyone other than its own residents.  Any issue regarding damages will be addressed after the liability phase of this litigation is resolved.  See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 131 (2d Cir. 2010) ("In practice, courts generally bifurcate a CERCLA proceeding, determining liability in
(continued...)

pending dredging project they would have put the water intake in the Town of Stillwater, which is within the dredging zone. They seek the increased costs of building and operating the water intake upstream in Moreau. Halfmoon seeks the incremental costs associated with purchasing water from the City of Troy, instead of drawing water from its own treatment facility, during the dredging seasons. According to plaintiffs, they were forced to incur these damages to insure the safety of the public drinking water and avoid the threatened release/resuspension of PCBs during the dredging project.

## A. **Motion for Summary Judgment—Legal Standard**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must

---

(...continued)
    Phase I, and then apportioning recovery in Phase II.").

show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiffs' Motions for Partial Summary Judgment

The County/SCWA and Halfmoon have moved for partial summary judgment as to the liability of GE, and seek an inquest on damages. They put forth substantially the same arguments, and their motions will therefore be considered together. Plaintiffs assert they are entitled to partial summary judgment on the CERCLA claim (Second Cause of Action); New York Navigation Law claim (Fourth Cause of Action); public nuisance claim (Sixth Cause of Action); private nuisance claim (Seventh Cause of Action); and trespass claim (Eighth Cause of Action).[9] GE opposes each argument and asserts that the state claims are barred by the doctrine of conflict preemption.

### 1. CERCLA

Plaintiffs claim they have established GE's liability for response costs under CERCLA § 107(a), 42 U.S.C. § 9607.

---

[9] Plaintiffs do not include the Third, Fifth, and Ninth Causes of Action in their motions. At oral argument, plaintiffs' counsel clarified that they are not consenting to the dismissal of these claims, but rather believe they involve issues of material fact requiring trial.

CERCLA is a remedial statute enacted by Congress in 1980 "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602 (2009) (internal quotation marks omitted). CERCLA imposes strict liability on owners and operators of facilities at which hazardous substances were disposed and released into the environment. 42 U.S.C. § 9607(a); Burlington N., 556 U.S. at 608. Such makes the owners and operators liable for "all costs of removal or remedial action incurred by the United States Government . . . [and] any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A)–(B).[10]

Therefore, to establish liability under CERCLA, a plaintiff must show that:

(1) the defendant is an 'owner' or is otherwise liable under 42 U.S.C. § 9607(a)(1)–(4); (2) the site is a 'facility' as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or the threat; and (5) the costs and response conform to the National Contingency Plan.

Price Trucking Corp. v. Norampac Indus., Inc., 748 F.3d 75, 80 (2d Cir. 2014). The costs incurred must be "necessary." Id. "Response costs are deemed 'necessary' when an actual and real threat to human health or the environment exist[s]." Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 961 (9th Cir. 2013) (alteration in original) (internal quotation marks omitted), cert. denied, 134 S. Ct. 906 (2014).

It is undisputed that GE owned and operated the Hudson Falls and Fort Edward plants at the relevant time and that PCBs were released from those plants. The parties also

---

[10] Owners may escape liability in certain defined situations not applicable here. See id. § 9607(b).

agree that the plants are "facilities," plaintiffs are "persons," and PCBs are "hazardous substances" within the meaning of CERCLA.  Plaintiffs' CERCLA claims instead hinge on: (1) Whether the costs incurred in securing alternative sources of drinking water during the dredging project constitute "necessary costs of response"; and (2) whether the alternative water source projects were undertaken consistent with the National Contingency Plan ("NCP").  Further, as a threshold matter, GE claims CERCLA § 107(d)(1) precludes the recovery of <u>any</u> damages stemming from remedial actions ordered and supervised by the EPA.

### a. <u>Costs Related to Remedial Measures</u>

GE argues that CERCLA § 107(d)(1) precludes the recovery of damages stemming from remedial actions ordered and supervised by EPA, such as the dredging project in the Upper Hudson River.  This subsection states:

> [N]o person shall be liable . . . for costs or damages as a result of actions taken or omitted in the course of rendering care, assistance, or advice in accordance with the [NCP] or at the direction of an onscene coordinator appointed under such plan, with respect to an incident creating a danger to public health or welfare or the environment as a result of any releases of a hazardous substance or the threat thereof.

42 U.S.C. § 9607(d)(1).[11]

However, according to the "savings provision," this subsection does not relieve potentially responsible parties—such as GE—of liability for the release or threatened release of hazardous substances.  <u>Id</u>. § 9607(d)(3).  Section 107(d) was instead intended to protect innocent persons and entities, such as the EPA, contractors, consultants, and third-parties

---

[11]  This subsection does not preclude liability for costs or damages caused by the negligence of such person.  <u>Id</u>.

responding to emergency situations.  Indeed, the cases on which GE relies for this proposition involve the release of hazardous substances by emergency responders battling a fire at a facility that stored such materials, <u>AMW Materials Testing, Inc. v. Town of Babylon</u>, 584 F.3d 436, 440–41 (2d Cir. 2009), and the EPA conducting remedial actions within its authority, <u>Stewman v. Mid-South Wood Products of Mena, Inc.</u>, 784 F. Supp. 611, 615 (W.D. Ark. 1992).

Therefore, CERCLA § 9607(d)(1) does not apply to GE and does not defeat plaintiffs' motions for partial summary judgment.

### b. <u>Necessary Costs of Response</u>

Plaintiffs seek partial summary judgment declaring that the increased costs related to Halfmoon's purchase of drinking water from the City of Troy and the County and SCWA's water intake project in Moreau constitute necessary costs of response as a matter of law. They maintain that alternative sources of drinking water were necessary because the dredging project threatened harmful contamination of the water in the Upper Hudson River that posed health risks to their residents.

As defined in CERCLA, "response" means "remove, removal, remedy, and remedial action."  42 U.S.C. § 9601(25).  The definitions of "remove," "removal," "remedy," and "remedial action" specifically include the "provision of alternative water supplies"—such as Halfmoon's purchase of water from the City of Troy and the County and SCWA's intake at Moreau.  <u>Id</u>. § 9601(23)–(24).

Plaintiffs point out that, in November 2006, the EPA deemed the provision of alternative drinking water necessary "to protect the community from the potential hazard of consuming water that contains elevated levels of PCB as a result of the dredging."  Boyajian

Decl., Ex. 28, ECF No. 201-30, at 4. GE itself strongly opposed dredging the Upper Hudson River when the EPA first proposed the project. It warned that dredging would resuspend PCBs into the water, causing increased contamination. Further, through the March 2009 modification to the Consent Decree, GE agreed to pay the EPA seven million dollars toward the design and construction of the water line linking Halfmoon and the City of Troy. These undisputed facts undermine GE's current, and somewhat hypocritical, argument that plaintiffs did not need to provide alternative sources of drinking water at the inception of the dredging project.

In response to plaintiffs' argument, GE puts forth its expert toxicologist, Dr. Brent D. Kerger, Ph.D., who opined that the increased PCB levels during dredging did not render the Upper Hudson River unsafe as a source of drinking water. In fact, he reported that the increased PCB levels caused by dredging would not create significant human health risks even if sustained continuously for ten years. Plaintiffs seek to preclude Dr. Kerger's testimony. Even assuming—without yet deciding—that Dr. Kerger's testimony and opinions are admissible, such is based on data collected during and after Phase 1 of the dredging project. It is thus irrelevant to the issue of whether the water in the Upper Hudson River was unsafe prior to the dredging project or whether the proposed dredging project posed a significant threat of harm to the public requiring action by plaintiffs.[12]

In short, GE does not put forth any evidence to dispute plaintiffs' assertion that the dredging project posed an actual threat to human health—a threat sufficiently significant to necessitate the provision, at least initially, of alternative drinking water to the public. The

---

[12] Dr. Kerger's testimony is instead relevant to the issue of damages, or the limitation thereof, if plaintiffs can establish liability.

issue of whether the threat of harm ever dissipated and when, if ever, the water in the Upper Hudson River became safe enough for public consumption is altogether separate and may limit the damages.[13]  Therefore, the increased costs associated with plaintiffs' respective alternative drinking water projects, at least initially, constitute necessary costs of response under CERCLA as a matter of law.  As such, at the liability phase of the trial, plaintiffs will not have to establish that it was necessary to provide alternative drinking water to their residents at the inception of the dredging project.  However, the County and SCWA will have one hurdle to overcome regarding the necessary prong of their CERCLA claim.

GE argues that the costs related to the County and SCWA's water intake project in Moreau are not necessary because the County decided to put the intake in Moreau before the EPA proposed the dredging plan in 2000.  GE concludes that the decision to locate the intake in Moreau was completely independent from the threatened resuspension of PCBs caused by the dredging.

The County and SCWA cite the testimony and declaration of John Lawler, Chairman of the SCWA's Board of Directors and a member of the County's Board of Supervisors.[14] Lawler reports that the County and SCWA would have located the water intake in the Town

---

[13]  Although the dredging undisputably resulted in the resuspension of PCBs into the water column, caused a "redeposit" of PCBs downstream, and released oil sheens on the river, a review of the voluminous exhibits in the record indicates that this issue is particularly fact-specific and, therefore, more appropriately determined by the jury during the damages phase of this litigation.  Indeed, GE acknowledges that the 500 ppt water quality standard was exceeded at least three times during Phase 1 of the dredging project.  GE also admits that fourteen (14) water samples collected during a "High Flow Event" between March 23 and March 27, 2010, exceeded the 500 ppt standard.  Def.'s Resp. to Pl.'s Statement of Material Facts, ECF No. 227-36, ¶ 128.  GE challenges the reliability of some of the water samples cited by plaintiffs—specifically, those samples collected at the Thompson Island station.  However, such is an issue of credibility to be contemplated by the jury during the damages phase.

[14]  Lawler is also the Town Supervisor for the Town of Waterford, which was initially a plaintiff in this action.  He has also served as a member of the Hudson River PCBs Superfund Site Community Advisory Group, which provides a forum for the community to exchange information with the EPA regarding the dredging project.

of Stillwater but for the threat of contamination and resuspended PCBs from the dredging. Lawler Decl., ECF No. 201-88, ¶ 13. According to Lawler, the County was forced to move the intake upstream of the proposed dredging site to avoid harmful contamination caused by the dredging project.

In response, GE points to the 1990 intermunicipal water study by Clough Harbor & Associates, which established a water supply master plan and noted the "superior quality" and stability of the water at the Moreau site. Boyajian Decl., Ex. 59, ECF No. 201-61, at SCWA-3241–43. The study identified the Moreau site as the optimal choice for a raw water source "[b]ased on the advantages associated with economical implementation." Id. at SCWA-3362.[15]

Clough Harbor & Associates updated the master plan in 1995 and 2002. The 1995 report takes into account several changes in the County's water supply systems and concludes that the SCWA "should continue to follow a multi-phase plan to develop the Upper Hudson River water source [at the Moreau site] as the County's main water supply." Boyajian Decl., Ex. 61, ECF No. 201-63, at SC9626. The 2002 report noted that "[d]ue to its high water quality and virtually unlimited capacity, it is recommended that the Upper Hudson River remain as the ultimate water source for a County-wide water system." Boyajian Decl., Ex. 64, ECF No. 201-66, at SCWA-3569. It further indicated that the dredging project downstream of the Moreau site "may have significant environmental impacts in this area." Id.

These conflicting accounts, and the evidence cited therein, present an issue of material fact as to whether the County and SCWA's decision to locate the water source

---

[15] The 1990 report identifies the "Upper Hudson River" as the recommended source. Id. This term is used to describe the master plan option that uses the Moreau site as a source. Id. at SCWA-3241.

intake in Moreau was an effort to avoid resuspended PCBs during the dredging project or was completely independent from the proposed dredging project. If the former is true, then the increased costs of locating the intake in Moreau constitute necessary costs of response. If the latter is true, then the costs associated therewith are not necessary response costs because the County and SCWA would have incurred same regardless of the dredging project.

Finally, and somewhat related, GE claims the costs incurred by the County and SCWA stemmed from their decision to locate the drinking water source upstream at the Moreau site, not from efforts to remediate an existing water supply. As the County and SCWA point out, however, response costs are not limited to ridding existing water supplies of contaminates. CERCLA defines "drinking water supply" as "any raw or finished water source that is or <u>may be</u> used in a public water system." 42 U.S.C. § 9601(7) (emphasis added). Therefore, the fact that the County and SCWA's costs did not stem directly from the remediation of an existing municipal water supply is not fatal to their claim.

In sum, the increased costs stemming from the provision of alternative drinking water before the inception of the remedial dredging project constitute "necessary costs of response" within the meaning of CERCLA as a matter of law. See <u>Artesian Water Co. v. New Castle Cnty.</u>, 851 F.2d 643, 651 (3d Cir. 1988) ("[I]f a municipal water supply is imminently threatened . . . a governmental body may, and should, act decisively to obtain alternative water supplies in order to abate the public's exposure to health risks. In that case, recovering costs of an alternate water supply from the responsible parties would be a necessary expense in preventing potentially serious consequences of a hazardous substance leak." (internal citation omitted)).

Therefore, Halfmoon need not prove the necessary prong of its CERCLA claim at the liability phase of the trial. However, an issue of material fact remains regarding the necessary prong of the County and SCWA's CERCLA claim. Specifically, a jury must determine whether the County and SCWA located the water intake at the Moreau site because of the threatened resuspension of PCBs and contamination caused by the dredging project, or whether such was independent of the dredging project.

### c. **Compliance with the NCP**

Plaintiffs also seek partial summary judgment on the issue of whether their respective alternative water source projects were undertaken consistent with the NCP. GE argues that plaintiffs failed to conduct proper site evaluations and feasibility studies prior to selecting and constructing their respective alternative water sources.

The NCP is essentially "the federal government's roadmap for responding to the release of hazardous substances." Niagara Mohawk, 596 F.3d at 121. It details "the steps the government must take to identify, evaluate, and respond to hazardous substances in the environment." Id. at 136; see also 40 C.F.R. Part 300.[16] A party's entitlement to reimbursement for response costs is dependent on adherence to the NCP. Niagara Mohawk, 596 F.3d at 136. Remedial actions taken by the federal or state government are presumptively consistent with the NCP. Id. at 137. Other entities must establish compliance. Id. One way of doing so is by showing their response was conducted "under the monitoring, and with the ultimate approval, of the state's environmental agency" or the EPA. Id.; APL

---

[16] For example, the NCP describes the "methods, procedures, and criteria" that an agency must use when conducting a remedial site evaluation. 40 C.F.R. § 300.420. It also prescribes a "remedy selection process" to be followed when determining the proper remedial action plan. Id. § 300.430. In addition, the NCP provides for interaction with the local community and public comment when determining the proper remedial course. Id. § 300.700(c)(6).

Co. Pte. Ltd. v. Kemira Water Solutions, Inc., 999 F. Supp. 2d 590, 620 (S.D.N.Y. 2014). Courts are to consider the totality of the circumstances and analyze consistency with the NCP by a "substantial compliance" standard. APL Co. Pte. Ltd., 999 F. Supp. 2d at 620. Indeed, "immaterial or insubstantial deviations" from the NCP do not necessarily render remedial actions inconsistent. 40 C.F.R. § 300.700(c)(4).

The record shows that the EPA and/or NYDEC conducted various feasibility studies, issued final decisions in response to GE's disputes, and engaged in public discussions regarding the dredging project. In the 2002 ROD, the EPA described, *inter alia*, the Upper Hudson River site location, its history and characteristics, and the risks the contamination posed to human health and the environment. See Engel Decl., Ex. D, ECF No. 206-6. It also detailed the public participation and community interaction, outlined the scope and objectives of remedial action, and discussed available alternatives to dredging. Id. The 2002 ROD established Applicable or Relevant and Appropriate Requirements, which set compliance standards to guide the remediation efforts. Id. at 51–52. The EPA then provided an in-depth review of the selected remedy—dredging the Upper Hudson River in two phases—and reported that "EPA and the State of New York believe the selected remedy complies with the CERCLA and NCP provisions dealing with the remedy selection." Id. at 94–98, 105.

In November 2006, the EPA deemed the provision of alternative drinking water necessary "to protect the community from the potential hazard of consuming water that contains elevated levels of PCB as a result of the dredging." Boyajian Decl., Ex. 28, ECF No. 201-30, at 4. The agency determined that such "contingency measures" were "within the scope of the remedy set forth in the [2002] ROD" as well as "within the scope of the

- 20 -

Administrative Order on Consent for Remedial Design and Cost Recovery . . . and the Consent Decree." Id. The EPA further found that engaging in a public discussion regarding water supply protection and requiring alternative water sources was consistent with its Remedial Action Community Health and Safety Plan. Id. at 4–6.

This evidence addresses the dredging of the Upper Hudson River and the provision of alternative water sources in general. It shows that the EPA and NYDEC had intimate involvement in planning and conducting the dredging project as a whole, and it would establish that the actual dredging of the river has been conducted in substantial compliance with the NCP. However, it does not specifically endorse the plaintiffs' respective plans for providing their citizens with alternative drinking water during the dredging. Therefore, plaintiffs must point to additional evidence to meet their initial burden for partial summary judgment on the issue of whether their particular water source projects were consistent with the NCP.

Halfmoon notes that the EPA established Water Supply Decision Criteria to determine when it would reimburse Halfmoon for incremental costs of using the City of Troy's water. In September 2011, the EPA and Halfmoon entered into an agreement through which the EPA has reimbursed Halfmoon for such incremental costs incurred from March 26, 2010, through the end of the 2012 dredging season, and during all dredging seasons thereafter. Halfmoon argues that the EPA's coverage of these incremental costs indicates the Water Supply Decision Criteria had been triggered, shows the EPA monitored the provision of alternative drinking water, and suggests compliance with the NCP.

In response, GE points out that the EPA has only partially reimbursed Halfmoon for costs related to the City of Troy water supply, suggesting the Water Supply Decision Criteria

was not triggered as often as Halfmoon implies.[17]  In fact, even though Halfmoon

continuously purchased water from Troy during Phase 1 of the dredging and backfilling—

which occurred between May 15 and December 4, 2009—the EPA determined that the

Water Supply Decision Criteria was triggered only three times during that time period.  Engel

Decl., Ex. BB, ECF No. 206-35, at HM016230–31 (noting that the Criteria was met from

August 2–28; September 11 through October 5; and October 15 through November 11).

Moreover, GE notes that Halfmoon did not consider possible cost-effective alternatives, such

as simply filtering the water during dredging.

The County and SCWA point out that they commissioned an intermunicipal water

study in 1990 and ordered updated reviews in 1995 and 2002.  The 2002 review specifically

addressed concerns related to the anticipated dredging project.  Moreover, according to

Robert W. Streeter, an Environmental Program Specialist II with the NYDEC, the NYDEC

thoroughly reviewed the County's March 2006 application for a water supply permit for a

water intake on the Hudson River in Moreau.  Mr. Streeter reported that the application

conformed with applicable state laws, namely that the project was justified by public

necessity and that the County considered other sources of water supply.  See Boyajian Decl.,

Ex. 78, ECF No. 201-80.  The NYDEC granted the County a permit in December 2006.

In response, GE again maintains that the County and SCWA failed to adequately

study or consider alternatives to the intake at Moreau.  For example, GE claims the County

did not assess whether it was feasible and more cost-effective to filter the drinking water

---

[17]  GE also claims section 114(b) of CERCLA bars Halfmoon from recovering costs for which it has already been reimbursed or has an agreement to be reimbursed by EPA in the future.  See 42 U.S.C. § 9614(b).  Halfmoon reports that it is obligated to reimburse EPA in the event it recovers from GE any costs for which EPA payments have been made.  This matter of damages will be revisited, if necessary, once the issue of liability is resolved at trial.

during dredging.  Also, as noted above, an issue of material fact remains regarding the extent to which the County and SCWA considered and studied alternatives to the Moreau site.

Finally, as GE points out, plaintiffs' alternative water supply projects were not carried out in specific adherence to a consent decree with NYDEC.  Such distinguishes this case from Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112 (2d Cir. 2010), upon which the County relies for the proposition that remedial measures conducted under the close monitoring of the NYDEC are presumptively compliant with the NCP.  The potentially responsible party in Niagara Mohawk had entered into a consent decree with the NYDEC.  The Second Circuit held that plaintiff's "adherence to the DEC Consent Decree established its compliance with the [NCP]."  Id. at 137.  Here, plaintiffs have not entered into a formal agreement with the EPA or NYDEC under which their particular alternative drinking water projects were conducted.  Thus, the issue of substantial compliance with the NCP is not as clear as it was in Niagara Mohawk.

In sum, the various studies, reports, and decisions issued by the EPA and NYDEC show the dredging of the Upper Hudson River has been conducted in substantial compliance with the NCP.  However, such is not determinative of plaintiffs' compliance with the NCP vis-a-vis their water supply projects that were necessitated by the dredging.  Issues of material fact exist regarding whether plaintiffs' specific projects were chosen and implemented in substantial compliance with the NCP.  For example, a jury must determine whether the EPA and NYDEC were sufficiently involved in the selection, implementation, and monitoring of the projects to create a presumption of compliance.  Whether plaintiffs adequately considered alternatives must also be determined.

Plaintiffs' motions for partial summary judgment on the CERCLA claims will be denied.

## 2. **State Claims—Doctrine of Conflict Preemption**

Plaintiffs seek partial summary judgment on most of their state law claims. In response, GE argues that all state claims are barred by the doctrine of conflict preemption because the dredging project is mandated by the Consent Decree.

Plaintiffs correctly note that CERCLA contains "saving clauses" suggesting Congress did not intend to completely preempt state laws related to hazardous materials contamination. See 42 U.S.C. § 9614(a) ("Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State."); 42 U.S.C. § 9652(d) ("Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants."). However, the doctrine of conflict preemption is an affirmative defense available to GE "notwithstanding the presence of the saving clauses." New Mexico v. Gen. Electric Co., 467 F.3d 1223, 1244 (10th Cir. 2006).

Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility or when state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Marsh v. Rosenbloom, 499 F.3d 165, 177 (2d Cir. 2007) (internal quotation marks and citation omitted).

It is impossible for GE to comply with the requirements of the Consent Decree without subjecting itself to liability under state statutory and common law, which is an obstacle to the execution of the dredging project. Indeed, the EPA-mandated dredging necessarily resuspends PCBs in the water column, which forms the basis of plaintiffs' state law claims.

Plaintiffs' attempt to frame their state law claims broadly to include the original discharge of PCBs from the GE plants is unavailing.[18]  This case is about the dredging project and the environmental and health threats stemming therefrom.  Plaintiffs knew about, or should have known about, the PCB contamination as early as the 1980s when the EPA published a study of the affected area.  At the latest, plaintiffs should have known of the contamination by 2000 when the EPA proposed a remediation plan.  They did not initiate this action until 2009, on the eve of the dredging project.  In fact, the First Cause of Action sought an injunction staying the project.[19]

In short, plaintiffs' state law claims interfere with the implementation of a remedial action ordered by a federal agency (EPA), per federal law (CERCLA), approved by this federal court.  They are thus preempted.  See N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc., No. 84-0152, 2005 WL 1129763, at *12 (D.N.J. May 11, 2005) ("Under the Supremacy Clause of the U.S. Constitution, a judicial decree entered by a federal court cannot be vitiated by a state law that essentially prevents decree compliance." (footnote omitted)); New Mexico v. Gen. Electric Co., 335 F. Supp. 2d 1185, 1226 (D.N.M. 2004) (where plaintiffs seek "to recover additional damages from parties complying with an EPA order on the theory that the EPA's chosen remedy is somehow inadequate, a collision . . .

_____

[18]  Plaintiffs cite caselaw suggesting state law claims brought concurrently with CERCLA § 107(a) claims do not conflict with CERCLA's settlement scheme and are thus not preempted.  However, these cases involved state claims against potentially responsible parties for the initial contamination, not state claims based on re-contamination caused by federally-mandated remedial actions.  See, e.g., MPM Silicones, LLC v. Union Carbide Corp., 931 F. Supp. 2d 387, 403 (N.D.N.Y. 2013) (Kahn, J.); New York v. Ametek, Inc., 473 F. Supp. 2d 432, 433 (S.D.N.Y. 2007).  Those cases do not create a comparable direct conflict with ongoing cleanup operations that have been ordered by EPA and approved by a federal court.

[19]  These facts evidence plaintiffs' intent for this case to address the risks posed by the dredging project, not the original discharge of pollutants.  They would also preclude any state common law claims related to the original discharge.  Indeed, such claims would be untimely.  See N.Y. C.P.L.R. § 214(4) (actions for injury to property must be commenced within three years of plaintiffs' awareness of the injury).

between state tort damages remedies and the CERCLA statutory and regulatory scheme appears inevitable"); Coastline Terminals of Conn., Inc. v. USX Corp., 156 F. Supp. 2d 203, 208–09 (D. Conn. 2001) (plaintiff's claims pursuant to state statutory and common law "disrupt[] CERCLA's settlement incentive scheme by providing a potential avenue for recovery against a potentially responsible party that has settled a CERCLA action" and are thus preempted).

Plaintiffs' assertion that they simply seek monetary damages, and do not directly challenge the dredging project, is similarly without merit. See New Mexico, 467 F.3d at 1249–50 ("The State's argument that it is not seeking to alter or expand the EPA's response plan but rather only to acquire money damages falls on deaf ears. . . . Accepting the State's argument might place GE and ACF in the unenviable position of being held liable for monetary damages because they are complying with an EPA-ordered remedy which GE and ACF have no power to alter without prior EPA approval.").

Therefore, as they are based on the resuspension of PCBs during the dredging project, plaintiffs' state claims are barred by the doctrine of conflict preemption. To hold otherwise would be counter to the purposes of CERCLA; to wit, to encourage settlements and the prompt cleanup of contaminated sites. However, CERCLA specifically excludes from coverage damages related to petroleum contamination. 42 U.S.C. § 9601(33). Thus, plaintiffs' New York Navigation Law claims related to GE's alleged release of petroleum are not preempted by CERCLA. See Coastline Terminals, 156 F. Supp. 2d at 209.

### 3. **New York Navigation Law**

Plaintiffs argue that they are entitled to partial summary judgment on their New York Navigation Law claims.

This statute states in pertinent part:  "Any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained . . . ."  N.Y. NAV. LAW § 181(1).  The Navigation Law is to be construed liberally.  See id. § 195 ("This article, being necessary for the general health, safety, and welfare of the people of this state, shall be liberally construed to effect its purposes.").  Further, "petroleum" is broadly defined as "oil or petroleum of any kind and in any form including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and kerosene."  Id. § 172(15).

The parties dispute whether PCBs are "petroleum" within the meaning of the Navigation Law.  Plaintiffs argue that PCBs are petroleum-based.[20]  Specifically, they maintain that GE refined and mixed the PCBs with other substances to create a "dielectric fluid" which it then sold as "Pyranol."  Plaintiffs claim Pyranol contains petroleum, and they point to the oil sheens observed on the river during Phase 1 of the dredging project.  Moreover, in its Answers to both Complaints, GE admitted "that there is oil containing PCBs in the groundwater at the Fort Edward facility."  Am. Answer, ECF No. 88, ¶ 31 (Lead Case); Answer, ECF No. 17, ¶ 21 (Member Case).  GE maintains that the use of terms such as "PCB oils" and "oil sheens" does not mean that PCBs are petroleum as a matter of law.

Whether plaintiffs can ultimately prove the PCBs that have been resuspended in the Hudson River as a result of the dredging project are petroleum-based or have been mixed

---

[20]  In fact, they claim the PCBs at issue are covered under both CERCLA and the Navigation Law because, although CERCLA's definition of hazardous substances excludes petroleum, it does contemplate toxic substances added to petroleum—such as PCBs.  See Booth Oil Site Admin. Grp. v. Safety-Kleen Corp., 532 F. Supp. 2d 477, 510 (W.D.N.Y. 2007) ("CERCLA's definition of hazardous substance does include hazardous substances which are added to petroleum or which increase in concentration solely as a result of contamination of the petroleum during use.").

with petroleum is an issue of fact to be determined at trial.  See Booth Oil, 532 F. Supp. 2d at 510–11 (allowing CERCLA and Navigation Law claims to go forward because plaintiff could have incurred damages responding to petroleum discharges, which are outside of CERCLA, as well as PCB contamination, which are within CERCLA's ambit).

GE also asserts that any resuspended PCBs—whether petroleum-based or not—cannot form the basis for plaintiffs' Navigation Law claims because the dredging project was ordered by the EPA and approved by this Court.  Thus, according to GE, the PCBs discharged by the dredging were "permitted" discharges.  The Navigation Law's blanket prohibition on the release of petroleum "shall not apply to discharges of petroleum pursuant to and in compliance with the conditions of a federal or state permit."  N.Y. NAV. LAW § 173(3).  CERCLA provides that "[n]o Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite, where such remedial action is selected and carried out in compliance with this section." 42 U.S.C. § 9621(e)(1). Pursuant to the Consent Decree, GE is exempt from obtaining federal, state, or local permits to build and operate the on-site processing facility relative to the dredging project.

While these facts certainly excuse GE from obtaining the proper permits related to the on-site dredging operations, they do not necessarily mean the alleged discharges of petroleum during the dredging project were "pursuant to and in compliance with the conditions of a federal or state permit."  Therefore, the alleged discharge of petroleum-based PCBs cannot be deemed "permitted" as a matter of law.

## C. **GE's Motions for Summary Judgment**

The parties assert substantially similar arguments in support of and in opposition to GE's motions for summary judgment.  Therefore, GE's motions will be briefly summarized

and resolved in short order.

## 1. CERCLA

GE argues that the County and SCWA's increased costs of establishing a water intake at Moreau, instead of Stillwater, were not necessary response costs within the meaning of CERCLA because: (1) Costs incurred to avoid contamination (as opposed to cleanup costs) are not recoverable; and (2) the creation of the County Water System at Moreau was not designed to replace contaminated water and is thus not an "alternative water supply."

As explained above, the dredging project posed an actual threat to human health that necessitated the provision, at least initially, of alternative drinking water to the public. As such, the costs associated with plaintiffs' alternative drinking water projects, at least initially, constitute necessary costs of response as a matter of law. Moreover, in light of the parties' conflicting arguments and evidence in the record, there remains an issue of material fact as to whether the County and SCWA located the water source intake in Moreau in an effort to avoid possible resuspended PCBs during the dredging project. Finally, response costs are not limited to ridding existing water supplies of contaminates. See 42 U.S.C. § 9601(7) ("drinking water supply" is defined as "any raw or finished water source that is or may be used in a public water system" (emphasis added)).

GE also argues that plaintiffs' construction costs were not incurred in substantial compliance with the NCP because they did not perform proper remedial investigations or feasibility studies prior to locating the water intake at Moreau (the County and SCWA) or tapping into the City of Troy's water (Halfmoon). As discussed in detail above, the parties have cited conflicting evidence in the record relating to this issue. In short, the same conflicting arguments and supporting evidence that preclude partial summary judgment in

plaintiffs' favor also prevent granting GE summary judgment on the CERCLA claims.[21]

## 2. **New York Navigation Law**

Finally, GE argues that the Navigation Law claims fail because the PCBs are not "petroleum" and any damages stemming from the release of PCBs are recoverable under CERCLA, not New York Navigation Law.

As previously explained, CERCLA specifically excludes from coverage damages related to petroleum contamination. 42 U.S.C. § 9601(33). Therefore, plaintiffs' Navigation Law claims related to GE's alleged release of petroleum are not preempted by CERCLA. See Coastline Terminals, 156 F. Supp. 2d at 209. Moreover, whether the PCBs that have been resuspended in the Hudson River during the dredging project are petroleum-based or have been mixed with petroleum is an issue of fact to be determined at trial. See Booth Oil, 532 F. Supp. 2d at 510–11.

## D. **Future Course of the Litigation**

As previously noted, this case will proceed in two phases to address GE's liability, or lack thereof, and damages, if any. Upon review of the pending motions to preclude the parties' experts, it is clear that some of the experts are only relevant to the liability phase of this litigation while others are relevant to the damages phase. Therefore, the litigation will proceed in the following manner:

First, the parties will provide notice of which experts, if any, they intend to call at the

---

[21] It is not necessary to address GE's claim that Halfmoon cannot recover costs incurred in relation to the operation and maintenance of its water treatment plant, which could not be used during dredging. GE persuasively argues that such costs would have been incurred regardless of the dredging project and are thus not "necessary response costs" under CERCLA. In a tacit concession, Halfmoon clarifies that these damages arise from its state law claims, not under CERCLA. See Pl.'s Mem. Opp'n Summ. J., ECF No. 225, 6.

liability phase of the trial.  If any of those identified experts are the subject of a pending motion to preclude, such motion will be decided.

Second, a trial date will be set.

Third, a trial on the liability of GE only will be conducted.

Fourth, if the jury finds GE liable on either or both of plaintiffs' two remaining claims, the parties will be directed to provide notice of which experts, if any, they intend to call at the damages phase of the trial.  If any of those identified experts are the subject of a pending motion to preclude, such motion will be decided.

Fifth, a trial date will be set.

Sixth, a trial on the issue of damages will be conducted.  The same jury will be brought back to decide the amount of damages.

In the interest of encouraging the efficient resolution of these matters, the following is a brief summary of the potential issues to be addressed at each phase of the litigation.

## 1.  Liability Issues

As detailed in this Memorandum–Decision and Order, there are several issues of material fact to be determined by a jury at the liability phase of the litigation.  With regard to the County and SCWA's claims, the following must be determined:  (1) Whether the decision to locate the intake in Moreau was an effort to avoid resuspended PCBs during the dredging project or was completely independent from the proposed dredging project; (2) whether the construction and operation of the water intake in Moreau was done in substantial compliance with the NCP; and (3) whether the resuspended PCBs are petroleum-based or have been mixed with petroleum.

With regard to Halfmoon's claims, it must be determined:  (1) Whether the

construction and operation of the alternative water supply line to the City of Troy was done in substantial compliance with the NCP; and (2) whether the resuspended PCBs are petroleum-based or have been mixed with petroleum.

The resolution of these issues will determine the liability of GE. If necessary, all arguments regarding damages will be addressed after the liability issues are resolved by a jury.

## 2. Damages Issues

The following list of potential issues to be addressed at the damages phase of the litigation is not intended to be exhaustive.

Assuming the County and SCWA establish GE's liability, the parties must address the following potential issues: (1) The amount of increased costs incurred as a result of constructing and operating the water intake in Moreau as opposed to the costs that would have been incurred had the intake been built in Stillwater; and (2) whether the County and SCWA are entitled to future damages related to the increased costs of operating and maintaining the Moreau intake and, if so, how to reasonably estimate same.

Assuming Halfmoon establishes GE's liability, the parties must then address the following potential issues: (1) The amount of increased costs incurred as a result of constructing and operating the water supply line and purchasing drinking water from the City of Troy as opposed to supplying drinking water through Halfmoon's existing treatment plant; (2) when, if ever, the water in the Upper Hudson River became safe to use as a source of drinking water, supplied by Halfmoon's existing water treatment plant; and (3) whether Halfmoon is entitled to recover costs for which it has already been reimbursed by the EPA and, if so, how much.

## IV.  CONCLUSION

This case is about the dredging of the Upper Hudson River and the threat to public health posed by the resuspension of PCBs during the dredging.  Plaintiffs' state law claims, except for the Navigation Law claims, are an obstacle to the execution of the dredging project and are thus barred by the doctrine of conflict preemption.  The Navigation Law claims hinge on whether plaintiffs can prove the PCBs that have been resuspended in the Hudson River as a result of the dredging project are petroleum-based or have been mixed with petroleum.

GE fails to rebut plaintiffs' assertion that the dredging project posed an actual threat to human health—a threat sufficiently significant to necessitate the provision, at least initially, of alternative drinking water to the public.  Therefore, the increased costs associated with Halfmoon's purchase of drinking water from the City of Troy, at least initially, constitute necessary costs of response under CERCLA as a matter of law.  However, before such a declaration can be made regarding the County and SCWA's costs stemming from the water intake in Moreau, a jury must determine whether the decision to locate the intake in Moreau was an effort to avoid resuspended PCBs during the dredging project or was completely independent from the proposed dredging project.

Conflicting accounts and evidence also present an issue of material fact regarding whether plaintiffs' specific alternative drinking water projects were chosen and implemented in substantial compliance with the NCP.  For example, a jury must determine whether the EPA and NYDEC were sufficiently involved in the selection, implementation, and monitoring of the projects to create a presumption of compliance, and whether plaintiffs adequately considered alternatives plans.

In short, plaintiffs' CERCLA and New York Navigation Law claims are the only claims

that survive the motions for summary judgment. A jury trial will be conducted to determine the liability of GE for the increased costs plaintiffs incurred from their respective alternative drinking water projects. Specifically, with regard to the CERCLA claims, a jury must determine: (1) Whether the County and SCWA's decision to locate the water source intake in Moreau was an effort to avoid resuspended PCBs during the dredging project or was completely independent from the proposed dredging project; and (2) whether the plaintiffs' particular alternative drinking water projects were chosen and implemented in substantial compliance with the NCP. With regard to the Navigation Law claims, a jury must decide whether the PCBs that have been resuspended in the Hudson River as a result of the dredging project are petroleum-based or have been mixed with petroleum.

Therefore, it is

ORDERED that

1. Plaintiffs the County of Saratoga and the Saratoga County Water Authority's motion for partial summary judgment is DENIED in its entirety;

2. Plaintiff the Town of Halfmoon's motion for partial summary judgment is DENIED in its entirety;

3. Defendant General Electric Company's motion for summary judgment against the County of Saratoga and the Saratoga County Water Authority is GRANTED in part and DENIED in part;

4. Defendant General Electric Company's motion for summary judgment against the Town of Halfmoon is GRANTED in part and DENIED in part;

5. All state law claims, except the New York Navigation Law claim, are DISMISSED;

6. Plaintiffs' federal CERCLA claim (Second Cause of Action) and plaintiffs' New York

Navigation Law claim (Fourth Cause of Action) remain for trial; and

7. The parties are directed to file, within thirty (30) days of the entry of this Order, notice of which experts, if any, they intend to call at the liability phase of the trial. This notice shall not exceed ten (10) pages and shall include a brief explanation of each expert's relevance to the issue of liability.

IT IS SO ORDERED.

_____
United States District Judge

Dated: May 12, 2015
       Utica, New York.